The MOTEL COMPANY, Petitioner,

v.

The COMMISSIONER OF INTERNAL REVENUE, Respondent.

No. 11, Docket 28709.

United States Court of Appeals
Second Circuit.

Argued Oct. 29, 1964.

Decided Jan. 18, 1965.

Monroe J. Winsten, New York City, for petitioner.

Lawrence B. Silver, Atty., Dept. of Justice, Washington, D. C. (Louis F. Oberdorfer, Asst. Atty. Gen., Lee A. Jackson, and Harry Baum, Attys., Dept. of Justice, on the brief), for respondent.

Before LUMBARD, Chief Judge, and HAYS and MARSHALL, Circuit Judges.

MARSHALL, Circuit Judge:

Taxpayer, The Motel Company, was organized on May 24, 1955 and four days later it acquired the Rip Van Winkle Motel in New Haven for $260,000. $107,200 was paid in cash, which was derived from the initial capital contribution of $10,000 and a purported $100,000 loan from Harry Shwartz, father of Leonard Shwartz, President and virtually sole stockholder of taxpayer. Harry Shwartz was neither a stockholder of record, a director nor an officer of taxpayer, yet he held a salaried position, he sometimes exerted efforts on behalf of taxpayer to obtain funds and his close relatives were the stockholders of record, directors and officers. The purported loan was secured by a third mortgage on the motel property and evidenced by a promissory note calling for a 10 percent interest per year and for semi-annual principal payments of $2,500 for ten years, at which time the balance was to become payable. Only the first installment of principal was paid, and although the purported note was in continuous default, Harry Shwartz never exercised his acceleration option.

Taxpayer deducted certain payments to Harry in 1956, 1957 and 1958 under § 163(a) of the 1954 Code, 26 U.S. C. § 163(a), as interest on indebtedness. The Commissioner disallowed these deductions and asserted a deficiency on the ground that the $100,000 advance was not a true loan, but rather a contribution to risk capital and hence the payments were not interest payments. The Tax Court upheld the Commissioner on this issue, and we affirm. See generally Gilbert v. Commissioner, 248 F.2d 399 (2 Cir.1957), 262 F.2d 512 (2 Cir.1959); Nassau Lens Co. v. Commissioner, 308 F.2d 39, 47 (2 Cir.1962). The Tax Court considered the close family relationships; the fact that the money was advanced at the very outset of the enterprise to supply more than one-third of the purchase price of its principal income-producing asset; that if the advance were to be considered a loan, and added to the $152,793.10 of outsiders' debt (represented by a first mortgage and a purchase money mortgage) incurred in purchasing the Rip Van Winkle Motel, the debt-to-equity ratio would be in excess of 25-to-1; the tightness of the money market on motels; and the unlikelihood of an outsider lending $100,000 to taxpayer at that time on a third mortgage. These factors are sufficient to justify the conclusion that the advance was a contribution to risk capital, not merely a risky-loan— an elusive categorization, to be sure, but one that is required by the fact that while "interest paid or accrued * * * on indebtedness" (§ 163(a)) is deductible, returns on or of capital are not. The conduct of the parties subsequent to the advance, or more specifically the failure of Harry to foreclose after the purported note was in default following the first installment tends to reinforce this conclusion. Almost three years after the initial default, purportedly in lieu of foreclosing the third mortgage, Harry took a quit-claim deed from taxpayer concerning the motel properties. However, the Tax Court properly discounted this by the fact that seven weeks prior to that transaction an Internal Revenue Agent audited taxpayer's return for the years here involved

and that, on the day after receiving the quit-claim deed, Harry leased the motel properties back to taxpayer for a 20-year term with renewal rights for three 10-year periods.

The advances did not cease after the inauguration of this business enterprise. During the period between December 27, 1955 and January 1, 1957, Harry advanced taxpayer a total of $236,000 to cover an expansion of the Rip Van Winkle. The Tax Court found favorably to taxpayer that this advance was a true indebtedness, a finding not in the least inconsistent with its decision concerning the $100,000 advance. The Commissioner took no appeal from this determination, and the only question before us involving this transaction is whether the Tax Court erred in restricting the interest deductions to the periods following December 31, 1956, thereby resulting in the disallowance of the claimed interest deduction covering the first eight months of the fiscal year ending April 30, 1957.

December 31, 1956 was the date on which the promissory note covering the $236,000 was executed. Prior to that time there was an understanding that Harry's advances were for the "temporary financing" of the expansion and that taxpayer would repay these advances by borrowing money from a lending institution after the construction of the new units. The promissory note was executed only after the expected bank loan did not materialize. The strongest argument to support taxpayer's claim that the interest on each segment of the $236,000 should run from the date that particular advance was made, derives from the Tax Court's determination that the "$236,000 advance was a true loan." The inference is that each segment of the $236,000 was a loan at the particular time it was advanced, and the fact that the advances were thought of as merely "temporary financing" and that there was an understanding that Harry was to be repaid by a bank loan soon after the new units were completed does not preclude this inference. The advances could be viewed, given the Tax Court's finding

that the aggregate $236,000 was a loan, as short term loans needed to tide taxpayer over until the new units were completed, which, once completed, could serve as security for a bank loan. However, not all loans oblige the debtor to pay interest and in the absence of such an obligation no interest deduction is permitted, notwithstanding payments to the creditor characterized by the debtor as interest payments. It is upon this ground that we affirm the Tax Court's ruling restricting interest deductions to the period following December 31, 1956. Two factors, wholly apart from the close personal relationships, lead us to this position. First, the minutes of the December 1955 board meeting, where the decision to embark on the expansion program was made, stated:

"Mr. Harry Shwartz agreed that if the building program progressed satisfactorily and with dispatch that he would waive any interest payments until all of the monies had been advanced. It being the understanding of both Mr. Harry Shwartz and the corporation that the loans were made for temporary financing only and it was further agreed that Mr. Harry Shwartz could require as additional security from the corporation a further secondary mortgage covering the new corporate properties at any time."

Although the bank loan eventually failed to materialize, the "waiver" was not conditioned upon that and it appears that the "building program progressed satisfactorily and with dispatch." The words "waive any interest payments" possibly could mean that the actual payments rather than the accrual of interest would be postponed until after the "all of the monies had been advanced." But we are led to reject that narrow interpretation by the obvious failure of the parties to agree upon any interest rate. Second, the minutes of the special meeting of the board on December 31, 1956, contain this statement:

"[Leonard Shwartz] further reported that in accordance with

the agreement made with Harry Shwartz, Harry Shwartz had advanced the corporation for temporary financing for each building program the sum of $236,500.00, and that [he] had caused to be executed a demand promissory note of the corporation in that amount bearing 10% interest *from date, namely December 31, 1956,* to Harry Shwartz." (Emphasis added.)

We can conceive of situations when the interest rate could be set sometime after the money is actually advanced, or near the end of a series of advances, with the intention that the interest would start running from the time of the advances rather than from the date of the execution of the note. It would be fair, however, to expect some clear indication of such an unusual understanding. The record is devoid of such an indication,[1] save for some rather self-serving book entries, and in fact, the minutes quoted above are an indication to the contrary.

■ In the fall of 1956 Leonard advanced $20,224.93 for taxpayer's working capital needs, and interest expense at the rate of 10 percent was deducted for the fiscal year ending April 30, 1958. The Tax Court held that the advance was a true loan, but that an interest deduction could only be taken at 6 percent, the rate

agreed upon in the promissory note. Commissioner did not appeal, and taxpayer's appeal only asks us to review this limitation on the interest rate.[2] Taxpayer claims that the note matured on February 15, 1957, that it was in default thereafter, and that the parties contracted for interest at a rate other than that reserved in the note, as they were free to do so after the note was in default. The Tax Court was unpersuaded, there being a total failure to prove such a subsequent agreement for the 10 percent rate and we affirm.

■■ The final issue in this appeal involves Leonard's use of an automobile belonging to taxpayer. Taxpayer deducted amounts for depreciation and for operating expenses, and Commissioner disallowed 25 percent of these deductions claiming that 25 percent of Leonard's use of the automobile was purely personal and for nonbusiness purposes, such as driving back and forth between home and the motel. The Tax Court affirmed the Commissioner's allocation between personal and business uses, and this allocation is not plausibly assailed by taxpayer. Instead, taxpayer's argument seems to be that part of Leonard's compensation as President and chief executive officer of the corporation was the use of the automobile for personal purposes.[3] However,

1. The promissory note is conspicuously silent on this issue; it reads in part:

"FOR VALUE RECEIVED, on demand, The Motel Company, a Connecticut corporation acting herein by Leonard D. Shwartz, its President hereunto duly authorized, hereby promises to pay to HARRY SHWARTZ, the sum of Two Hundred Thirty-Six Thousand, Five Hundred Dollars ($236,500), together with interest at the rate of ten (10%) per cent per annum, not in advance, together with all costs, expenses and attorney's fees incurred by the holder of this note in any proceeding for the collection of this note."

Taxpayer conceded that the $236,500 appearing in the note and the minutes is inaccurate and that the correct figure is $236,000.

2. The Tax Court's ruling regarding the $236,000 advance apparently eliminated

any deficiency for the fiscal year ending April 30, 1958 and the Tax Court found no deficiency for that year.

3. The conclusion that taxpayer apparently asks us to draw is that the operating expenses paid by taxpayer were merely necessary incidents to compensating Leonard in this fashion and therefore deductible under § 162(a), 26 U.S.C. § 162(a), as "ordinary and necessary expenses paid or incurred *during the taxable year* in carrying on any trade or business"; and more doubtfully that depreciation on the automobile was deductible under § 167(a) (1), 26 U.S.C. § 167(a) (1) on the theory that by using the automobile to compensate Leonard the property was being "used in the trade or business."

No argument has been made that the personal use of the automobile was a form of "dividend" to Leonard as prin-

it is equally possible, and far more plausible, that allowing Leonard to use the corporation's automobile for personal purposes was merely a display of non-business-oriented generosity, in that sense a gift and favor, not uncommonly conferred on principal employees and stockholders, see, e. g., United Aniline Co. v. Commissioner, 316 F.2d 701 (1 Cir. 1963), rather than additional compensation. Taxpayer utterly failed in proving that this was not the case [4] and we therefore affirm. Taxpayer has the burden of proving that the use of the car for personal purposes was intended as additional compensation, and this burden is particularly weighty when, as here, the beneficiary has unfettered control of the taxpayer-corporation.

Affirmed.

cipal stockholder, see W. D. Gale, Inc. v. Commissioner, 297 F.2d 270 (6 Cir. 1961)

4. For example, it appears that a sum equal to the value of the personal use of taxpayer's automobile was never included by Leonard in his income tax returns for the years here involved.