**GREAT WESTERN BANK & TRUST,**
**Plaintiff-Appellant,**

v.

**Sol KOTZ, Defendant-Appellee.**

**No. 74–1255.**

United States Court of Appeals,
Ninth Circuit.

March 22, 1976.

Charles Hoover (argued), of Jennings, Strouss & Salmon, Phoenix, Ariz., for amicus curiae.

## OPINION

Before BARNES, ELY and WRIGHT, Circuit Judges.

PER CURIAM:

This is another attempt to convert Section 10(b) of the Securities Exchange Act into a source of general federal jurisdiction. *Cf. Van Arsdale v. Claxton,* 391 F.Supp. 538 (S.D.Cal.1975). Great Western Bank & Trust (GWB) failed to receive payment on an unsecured note given by Artko Corporation (Artko). GWB now seeks to recover some of its losses as against Kotz, arguing that he was a controlling person in Artko and hence is liable for alleged material misrepresentations made in the course of the transaction. GWB argues that the note given by Artko is a security within the meaning of the 1933 and 1934 securities acts and seeks relief under § 17(a) of the Securities Act, 15 U.S.C. § 77q(a) (1970), § 10(b) of the Exchange Act, 15 U.S.C. § 78j(b) (1970) and SEC Rule 10b–5, 17 C.F.R. § 240.10b–5 (1974).

The district court, in granting defendant's motion to dismiss, held that the note of a corporation given to bank in exchange for a 10-month, renewable "line of credit" was not a "security" within the meaning of the federal securities laws. We affirm.

### I.

### SUMMARY JUDGMENT

The district court ruled: "The context of the present transaction requires this court to hold that the note in question is not a 'security' within the intent of the Security Acts." It then proceeded to dismiss the cause "for lack of jurisdiction." If the district court had ruled on the basis of the federal complaint alone, its action should more properly be regarded as a dismissal for failure to state a claim. *See Van Arsdale v. Claxton,* 391 F.Supp. 538, 539 (S.D. Cal.1975); *Ingenito v. Bermec Corp.,* 376 F.Supp. 1154, 1179 (S.D.N.Y.1974).

Paul Bonn (argued), of Brown, Vlassis & Bain, Phoenix, Ariz., for plaintiff-appellant.

Jock Patton (argued), of Streich, Lang, Weeks, Cardon & French, Phoenix, Ariz., for defendant-appellee.

However, dismissal for failure to state a claim would be improper "if, on any state of facts supporting the allegations of the complaint, plaintiffs have stated a valid claim." *Id. Cf. Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 101–102, 2 L.Ed.2d 80, 84 (1957). Therefore, if the ruling below is deemed to be a dismissal for failure to state a claim, it is erroneous.

■ We choose to regard the district court's action as the grant of summary judgment for defendant. Rather than adjudicating on the basis of the federal complaint alone, the court below considered much evidentiary material bearing on the question whether the note issued was a "security." It considered three documents: the "Demand Note," the "Loan Agreement," and the "Modification and Extension Agreement." It also considered two affidavits submitted by plaintiff. *See* C. Wright & A. Miller, Federal Practice & Procedure § 1350 at 558–59 (1969).

Having considered the complaint, the documents, and the affidavits, the district court held that the note was not a "security." Since that holding precluded plaintiff from obtaining a full trial on the question whether the note was a "security," we view the lower court's decision as being equivalent to a summary judgment in favor of defendant Kotz.

In reviewing the grant or denial of a summary judgment motion, we apply the same test that is initially employed by the trial court under Rule 56(c), Federal Rules of Civil Procedure. *Soria et al. v. Oxnard School District Board of Trustees*, 488 F.2d 579, 586 (9th Cir. 1973); *United States v. Bissett-Berman Corp.*, 481 F.2d 764, 767 (9th Cir. 1973). Applying that test, "[s]ummary judgment is 'proper only where there is no genuine issue of any material fact or where viewing the evidence and the inferences which may be drawn therefrom in the light most favorable to the adverse party, the movant is clearly entitled to prevail as a matter of law.' " *Caplan v. Roberts*, 506 F.2d 1039, 1042 (9th Cir. 1974), quoting

*Stansifer v. Chrysler Motors Corp.*, 487 F.2d 59, 63 (9th Cir. 1973).

*Radobenko v. Automated Equip. Corp.*, 520 F.2d 540, 543 (9th Cir. 1975) (footnote omitted). Our review standard is the same in securities litigation. *See Marx v. Computer Sciences Corp.*, 507 F.2d 485, 487 (9th Cir. 1974).

We view the following evidence, together with reasonable inferences therefrom, in a light most favorable to GWB, the non-movant. Appellant GWB is a banking corporation established and authorized to do business under Arizona law. In April of 1971 Artko through its then president Kotz obtained a line of credit of $1,500,000 from GWB. In the course of the transaction Artko executed and delivered an unsecured promissory note to the bank in that amount.

GWB sought, obtained and relied on considerable financial data prepared by Artko before extending the line of credit. The GWB–Artko transaction was part of a larger plan on the part of Kotz to obtain financing for Artko. GWB, as an unsecured creditor at the time of original issuance of the Artko note, relied upon the future earnings and net worth of Artko to recover principal and interest.

The instrument, while labeled a "demand note," actually had a maturity of 10 months, renewable by mutual agreement for one-year periods. It was "subject to" and "governed by" the accompanying "loan agreement," and was non-negotiable. The note bore "interest" at the rate of "¼ of 1% over the prime rate of interest then quoted in New York City, New York by the Chase Manhattan Bank (or its successor)." Such interest was payable monthly on the first day of each month. The note was approved by GWB's "Directors Loan Committee."

The "loan agreement" placed stringent limitations upon the borrower. The bank's money was to be used "for, and only for, borrower's 'working capital' and not for 'capital expenditures' as those terms are defined in accordance with generally accepted accounting principles." The borrower was required to maintain a minimum checking account balance with GWB of

$300,000 during the period of the borrowing and was to provide the bank with periodic financial statements.

The bank was allowed to inspect borrower's property and records upon "reasonable request." The borrower was required to maintain "consolidated working capital" of at least $4,000,000, and a net current position of at least $500,000. (Under the loan agreement the $4,000,000 figure excluded amounts borrowed from GWB.)

The borrower could engage in no future "unsecured borrowing" without the consent of the bank and could effect no organic changes or major transactions with its stockholders, with certain exceptions. Numerous acts of "default" were defined in the loan agreement.

Following the disclosure of some adverse financial information, GWB renegotiated the agreement to secure itself with Artko's personal property and other assets. Additional stringent limitations were also placed on the firm's business dealings. Artko subsequently entered a Chapter X bankruptcy proceeding.

In the above recitation of facts we have resolved numerous factual issues in favor of GWB. However, GWB argues that the district court, in granting defendant's motion, overlooked several remaining issues of material fact. First, "was the $1,500,000 paid to Artko for the general financing of Artko's business?" There is no genuine issue here, since by the terms of the loan agreement, the proceeds were to be used for "working capital," not "capital expenditures."

■ Second, "[h]ow were the proceeds in fact used by Artko? This issue is immaterial to this appeal, since the nature of an instrument is to be determined at the time of issuance, not at some subsequent time. Cf. S. E. C. v. United Benefit Life Ins. Co., 387 U.S. 202, 211, 87 S.Ct. 1557, 1562, 18 L.Ed.2d 673, 679 (1967), quoting S. E. C. v. Joiner Leasing Corp., 320 U.S. 344, 352–53, 64 S.Ct. 120, 124, 88 L.Ed. 88, 93–94 (1943).

■ Third, GWB asks whether and to what extent its risk of loss varied with Artko's management skills. Under the recent decisions of this court, asking whether GWB has provided "risk capital" subject to the management skill of Artko is the same as asking whether GWB has made an "investment" in return for Artko's "security." See El Khadem v. Equity Securities Corp., 494 F.2d 1224, 1229 (9th Cir.), cert. denied 419 U.S. 900, 95 S.Ct. 183, 42 L.Ed.2d 146 (1974); S. E. C. v. Glenn W. Turner Enterprises, Inc., 474 F.2d 476, 482 (9th Cir. 1973). In this respect, the issue raised is ultimately one of law.

However, it is clear to us that in appropriate circumstances a properly instructed jury can determine whether as a matter of fact a disputed instrument is or is not a "security." S. E. C. v. Joiner Leasing Corp., 320 U.S. 344, 351, 355, 64 S.Ct. 120, 123, 125, 88 L.Ed. 88, 93, 95 (1943); Tarvestad v. United States, 418 F.2d 1043, 1048 (8th Cir. 1969).

The district court essentially determined, after viewing all of the other relevant facts, that no jury question was presented with respect to the nature of the Artko note. It is this determination which we review.

## II.

### INTERPRETATION OF THE SECURITIES LAWS

Title 15 U.S.C. § 77b(1) (1933 Act) defines security as including "any note. . . .", exempting only those which arise "out of a current transaction or the proceeds of which have been or are to be used for current transactions, and which [have] a maturity at the time of issuance of not exceeding nine months . . . ." 15 U.S.C. § 77c(a)(3).

The Exchange Act similarly defines security as "any note . . . but shall not include . . . any note . . . which has a maturity at the time of issuance of not exceeding nine months . . . ." 15 U.S.C. § 78c(a)(10). These definitions of security have been held to be virtually identical, Tcherepnin v. Knight, 389 U.S. 332, 88 S.Ct. 548, 19 L.Ed.2d 564 (1967).

█ In interpreting the securities acts we are reminded that courts should

> construe the details of an act in conformity with its dominating general purpose . . . read text in the light of context and . . . interpret the text so far as the meaning of the words fairly permits so as to carry out in particular cases the generally expressed legislative policy.

*S. E. C. v. C. M. Joiner Leasing Corp.*, 320 U.S. 344, 350–351, 64 S.Ct. 120, 123, 88 L.Ed. 88, 92–93 (1943). As the Supreme Court noted recently, " '[A] thing may be within the letter of the statute and yet not within the statute, because not within its spirit, nor within the intention of its makers.' *Church of the Holy Trinity v. United States,* 143 U.S. 457, 459, 12 S.Ct. 511, 512, 36 L.Ed. 226 (1892)." *United Housing Foundation v. Forman,* 421 U.S. 837, 849, 95 S.Ct. 2051, 2059, 44 L.Ed.2d 621, 630 (1975).

The Congressional purpose underlying the securities laws has been recently interpreted by the Court:

> The primary purpose of the Securities Acts of 1933 and 1934 was to eliminate serious abuses in a largely unregulated securities market. The focus of the Acts is on the capital market [1] of the enterprise system: the sale of securities to raise capital for profit-making purposes, the exchanges on which securities are traded, and the need for regulation to prevent fraud and to protect the interest of investors.

*Forman, supra,* 421 U.S. at 849, 95 S.Ct. at 2059, 44 L.Ed.2d at 630.

The Court in *Forman* held that "stock" issued to purchasers of cooperative housing was not a security, since its purchasers were not obtaining an "investment in a common venture premised on a reasonable expectation of profits to be derived from the entrepreneurial or managerial efforts of others" but rather were "motivated by a desire to use or consume the item purchased . . . ." 421 U.S. at 852–53, 95 S.Ct. at

2060, 44 L.Ed.2d at 632. The Court reasoned:

> Because securities transactions are economic in character Congress intended the application of these statutes to turn on the economic realities underlying a transaction, and not on the name appended thereto.

421 U.S. at 849, 95 S.Ct. at 2059, 44 L.Ed.2d at 630.

The courts of appeals have followed this "economic realities" approach in holding that these statutory definitions should not be taken literally and that not all "notes" are securities:

> It does not follow, however, that every transaction within the interlocutory clause of § 10, which involves promissory notes . . . is within Rule 10b–5. The Act is for the protection of investors, and its provisions must be read accordingly.

*Zeller v. Bogue Electric Manufacturing Corp.,* 476 F.2d 795, 800 (2d Cir.), *cert. denied* 414 U.S. 908, 94 S.Ct. 217, 38 L.Ed.2d 146 (1973). *See also C. N. S. Enterprises, Inc. v. G & G Enterprises, Inc.,* 508 F.2d 1354 (7th Cir.), *cert. denied* 423 U.S. 825, 96 S.Ct. 38, 46 L.Ed.2d 40, 44 U.S.L.W. 3201 (Oct. 6, 1975); *McClure v. First National Bank of Lubbock,* 497 F.2d 490 (5th Cir. 1974), *cert. denied* 420 U.S. 930, 95 S.Ct. 1132, 43 L.Ed.2d 402 (1975); *Lino v. City Investing Co.,* 487 F.2d 689 (3rd Cir. 1973).

### III.

### RISK ANALYSIS AND THE COMMERCIAL–INVESTMENT DICHOTOMY

█ To determine whether the transaction under review involves an "investment" in return for "securities" within the meaning of the securities laws, we analyze the nature and degree of risk accompanying the transaction to the party providing the funds. *See El Khadem v. Equity Securities Corp.,* 494 F.2d 1224 (9th Cir.), *cert. denied*

---

1. The "capital market" referred to by the Court includes debt as well as equity instruments. *See Investment Company Institute v. Camp,*

401 U.S. 617, 635, 91 S.Ct. 1091, 1101, 28 L.Ed.2d 367, 380 (1971), quoted *infra* note 2 of concurring opinion.

419 U.S. 900, 95 S.Ct. 183, 42 L.Ed.2d 146 (1974). The inquiry is whether the funding party invested "risk capital." *Id.* at 1229.[2]

This "risk" inquiry is not a simple one. As the Seventh Circuit recently recognized:

In one sense every lender of money is an investor since he places his money at risk in anticipation of a profit in the form of interest. Also in a broad sense every investor lends his money to a borrower who uses it for a price and is expected to return it one day.

*C. N. S., supra,* 508 F.2d at 1359.

In the context of this case we must distinguish between the "risky loan" and "risk capital." *Motel Co. v. Comm'r,* 340 F.2d 445, 446 (2d Cir. 1965). This distinction has been framed by the courts of appeals as the "commercial-investment dichotomy." *C. N. S.,* 508 F.2d at 1361; *Zabriskie v. Lewis,* 507 F.2d 546, 551 (10th Cir. 1974); *McClure,* 497 F.2d at 495; *Lino,* 487 F.2d at 694–95; *Zeller,* 476 F.2d at 800. *See also* SEC Release No. 33–4412, 26 Fed.Reg. 9159 (1961).

It is not enough to conclude *ipse dixit*: "A commercial bank's business is lending money not trading in securities." *McClure,* 497 F.2d at 495. In fact, banks may and do trade in securities. *See* 12 U.S.C. § 24; Ariz.Rev.Stat. § 6–322 (1974 Supp.). Thus we must determine whether in the instant case the promissory note held by GWB was in economic reality a "security," received in exchange for the bank's "investment."

Our ultimate inquiry is whether GWB has contributed "risk capital" subject to the "entrepreneurial or managerial efforts" of Artko. *Forman,* 421 U.S. at 852, 95 S.Ct. at 2061, 44 L.Ed.2d at 632. *El Khadem,* 494 F.2d at 1229. *See also Parvin v. Davis Oil Co.,* 524 F.2d 112, 116 (9th Cir. 1975). Scrutiny of a number of factors aids us in properly framing the ultimate question. *See generally C. N. S.,* 508 F.2d at 1361.

The most important factor is *time. Cf. Nye v. Comm'r,* 50 T.C. 203, 212 & n. 9 (1968). While courts now consider the Exchange Act's nine-month exemption [15 U.S.C. § 78c(a) (10)] as nondispositive of the commercial-investment issue,[3] it is true that the longer one's funds are to be used by another, the greater the risk of loss.

A demand or short-term note is almost *ipso facto* not a security unless payment is dependent upon the success of a risky enterprise, or the parties contemplate indefi-

---

2. The *Forman* Court reserved judgment on the appropriateness of this approach, finding it unnecessary to engage in "risk capital" analysis to dispose of the particular case before it. 421 U.S. at 857 n. 24, 95 S.Ct. at 2063, 44 L.Ed.2d at 635. However, the Supreme Court has used risk analysis in the past where appropriate to resolution of the issue confronted. *See SEC v. United Benefit Life Ins. Co.,* 387 U.S. 202, 210–11, 87 S.Ct. 1557, 1562, 18 L.Ed.2d 673, 678 (1967); *SEC v. Variable Annuity Life Ins. Co. of America (VALIC),* 359 U.S. 65, 71–72, 79 S.Ct. 618, 622, 3 L.Ed.2d 640, 644 (1959). *See generally* Hannan & Thomas, *The Importance of Economic Reality and Risk in Defining Federal Securities,* 25 Hast.L.J. 219, 226–28 (1974).

While *United Benefit Life, VALIC* and *El Khadem* each involved "investment contracts," the Supreme Court has now questioned the necessity of distinguishing between the "investment contract" and an "instrument commonly known as a 'security.'" *Forman,* 421 U.S. at 852, 95 S.Ct. at 2058, 44 L.Ed.2d at 629.

3. In the words of Judge Roney:

"We realize that our holding today that the Act does not apply to commercial notes of a longer duration than nine months, taken with the decisions voiding the short-term exemption as to investment paper, virtually writes that exemption out of the law. On the one hand, the Act covers all *investment* notes, no matter how short their maturity, because they are not encompassed by the 'any note' language of the exemption. On the other hand, the Act does not cover any commercial notes, no matter how long their maturity, because they fall outside the 'any note' definition of a security. Thus, the investment or commercial nature of a note entirely controls the applicability of the Act, depriving of all utility the exemption based on maturity-length. The original scrivener of the definitional section may well wonder what happened to his carefully drawn exemption on the way to the courthouse, but if the judicial decisions do not properly reflect the intent of Congress as to the coverage of the Act, only that body can properly rectify the situation at this point, if stare decisis is to apply and the Supreme Court does not make some definitive decision contrary to the presently decided cases."

*McClure v. First National Bank,* 497 F.2d 490, 494–95 (5th Cir. 1974).

nite extension of the note or perhaps conversion to stock. *See, e. g., Zeller,* 476 F.2d at 799 (maker of note could prevent demand by holder). While long-term notes generally look more like "securities," they may not be if, for example, they are callable at the will of the obligee. *Cf. Bazley v. Comm'r,* 331 U.S. 737, 742–43, 67 S.Ct. 1489, 1491–92, 91 L.Ed. 1782, 1787–88 (1947).

The existence and extent of *collateralization* is another important consideration. *See El Khadem,* 494 F.2d at 1230 n. 14. The unsecured lender is generally more dependent upon the managerial skills of the borrower than is a secured party who can look to the collateral in case of inability to repay.[4]

The *form* of the obligation must also be considered. While not controlling, the form utilized may help to explain the circumstances of issuance of the obligation.

The *circumstances* of issuance are particularly important. Whether the obligations were issued to a single party or to a large class of investors sheds light on the nature of the financing. *McClure,* 497 F.2d at 493; *Sanders v. John Nuveen & Co., Inc.,* 463 F.2d 1075, 1079–80 (7th Cir.), *cert. denied* 409 U.S. 1009, 93 S.Ct. 443, 34 L.Ed.2d 302 (1972).

Also important is the *relationship* between the amount borrowed and the size of the borrower's business, *C. N. S.,* 508 F.2d at 1361; the larger the relative amount, the greater the stake, and therefore the risk, of the lender.

Another important factor is the *contemplated use* of the proceeds. Proceeds constituting an essential ingredient of enterprise formation ("participation in the pot luck of the enterprise," *Camp Wolters Enterprises, Inc. v. Comm'r,* 230 F.2d 555, 560 (5th Cir. 1956)), are generally securities. On the other hand, those used to maintain current financial position generally are not. *McClure,* 497 F.2d at 494. *See also SEC v. Continental Commodities Corp.,* 497 F.2d 516, 525–27 (5th Cir. 1974). Generally funds spent on current operations generate faster return than do funds used for capital expenditure.[5]

We do not hold that application of any single factor discussed above compels us to affirm the judgment of the district court. Nor do we intimate that in a different case there would not be other factors to consider. *See C. N. S., supra,* 508 F.2d at 1362 & n. 14. The factors we have discussed relate to the undisputed material facts, together with those disputed facts viewed in a light most favorable to GWB, which are present in the record before us.

■ When all factors together are brought to bear, it is clear that Artko's promissory note does not rise to the dignity of a "security." The 10-month note could not be renewed absent the consent of GWB. In event of default within the 10-month period, GWB could demand accelerated payment of both principal and interest.

While the initial Artko note was not secured, the accompanying loan agreement required Artko to maintain a GWB checking account balance of at least $300,000. This readily attachable asset is tantamount to partial security. Moreover, the loan agreement allowed GWB to declare default

---

4. Of course this is not always so. An "investor" who is collateralized, for example, with common stock of the borrower may be as dependent upon the management skill of the borrower as is an unsecured lender. *Cf.* Plumb, *The Federal Income Tax Significance of Corporate Debt: A Critical Analysis and a Proposal,* 26 Tax L.Rev. 369, 571–72 (1971).

5. There are two commonly mentioned factors which we deem of little significance. First is negotiability. While it makes a note like cash, and presumably less like a security, stocks and bonds are generally negotiable. Therefore, the fact of negotiability does not help in the classification process. *But see* SEC Release No. 33–4412, 26 Fed.Reg. 9158 (1961).

Second is transaction impetus. When the consumer asks for a loan to finance a purchase, the note given is clearly not a "security." But a private party may also have surplus funds which need investment, and may initiate a financial transaction resulting in the acquisition of corporate securities in return for the funds provided. Analysis of the transaction impetus is thus not particularly helpful in drawing the commercial-investment line. *But see C. N. S.,* 508 F.2d at 1359.

or renegotiate the loan at the faintest sign of insecurity.[6]

In form, the "demand note" incorporated by reference the "loan agreement," which consistently referred to the parties as "borrower" and "lender." The transaction was referred to as being of the "line of credit" variety. Plaintiff's affiants variously referred to "the loan and line of credit," "plaintiff's lending decisions," the "loan transaction," and the "loan agreement."

█ GWB was the only lender involved in this transaction. Its risk was not interwoven with that of others. Accepting as true GWB's assertion that its loan was but one of many sought by Artko scarcely supports the conclusion that Artko was making the equivalent of a "public offering" resulting in investor risk-pooling. An individual business such as Artko may often solicit funds from numerous financial institutions at the same time. Yet where, as here, a disputed transaction is individually negotiated to suit the needs of both contracting parties, it cannot be seriously argued that the lender has pooled its "investment" with those of other institutions. Indeed, the negotiated loan agreement specifically prohibited Artko from assuming any "current unsecured borrowing" apart from loans from GWB and one named commercial bank.

The effect of requiring Artko to maintain a "consolidated working capital" of at least $4,000,000, together with the requirement that GWB's $1,500,000 be used only for "working capital," and not for "capital expenditures," meant that the full line of credit could not under the agreement exceed 37.5% of Artko's working capital at any one time. By these requirements GWB succeeded in limiting the risk assumed.

We now consider all of the above factors, together with their underlying facts, in the context of the entire GWB–Artko transaction to determine whether GWB has contributed "risk capital" subject to the "entrepreneurial or managerial efforts" of Artko.

As we said in Turner, 474 F.2d at 482, an instrument is generally a security if anticipated return on the funds provided depends largely upon "the undeniably significant . . . essential managerial efforts" of those other than the funding parties. In the instant case the district court was correct as a matter of law in holding that GWB was not so dependent.

GWB restricted Artko's use of the proceeds. It required Artko to maintain a certain minimum consolidated working capital and current position. It restricted Artko's future unsecured borrowing. Artko could not effect organic change without GWB's consent. Artko's records and property were subject to GWB's inspection upon reasonable request. Should Artko miss a payment, GWB was entitled to immediate acceleration.

In short, GWB left very little to chance. Artko could do little without answering to the bank. Under these circumstances no reasonable person could find that the return of GWB's funds depended largely upon the "essential managerial efforts" of Artko, within the meaning of our holding in Turner.

While some "risk" was created by the lending of money, it amounted only to that risk normally associated with the lending of money for a period of time.[7] There was no

---

6. The enforceability of this clause was made clear when, some two and one-half years after consummation of the original loan agreement, GWB did renegotiate the agreement to secure itself with certain Artko assets.

7. Earlier decisions of this court do not compel a contrary result. In Hector v. Wiens, 533 F.2d 429 (9th Cir. Feb. 23, 1976), we determined that summary judgment for defendant was improper because of the existence of a "genuine issue of material fact as to who had control of 'those essential managerial efforts which affect the failure or success of the enterprise.' " Id. at —— (slip op. at 5). Thus, the uncertainty of the "control" question made it impossible to conclude as a matter of law that return on the investment did not depend largely upon the managerial or entrepreneurial efforts of parties other than the investor. In the instant case, the record demonstrates beyond doubt that the return of GWB's funds did not depend largely upon the entrepreneurial or managerial efforts of Artko management.

substantial dependent relationship between GWB's risk and Artko's enterprise efforts. Even if, as it appears, GWB elected not to timely enforce the terms of the loan agreement and then found itself "throwing good money after bad," such subsequent conduct cannot retroactively affect the nature of the instrument first received by GWB.

## IV.

## CONCLUSION

Viewing all the evidence in a light most favorable to GWB, we conclude that the promissory note given by Artko bears no economic resemblance to the "securities" defined by the 1933 and 1934 acts. Counsel for GWB has not identified any disputed material facts which, if resolved in its favor, would support a contrary conclusion. Nor do we perceive any.

██ A note given to a bank in the course of a commercial financing transaction is not generally a security within the meaning of the federal securities acts. To expand the reach of those acts to ordinary commercial loan transactions would distort congressional purpose as we interpret it.

Kotz is clearly entitled to prevail as a matter of law. The decision of the district court is affirmed.

EUGENE A. WRIGHT, Circuit Judge (concurring):

I concur in the per curiam opinion. But, for another reason not discussed in it, I believe that GWB is not a "security" holder.

With one exception,[1] the courts have ruled that notes given by borrowers to

In *Safeway Portland Employees' Federal Credit Union v. C. H. Wagner & Co., Inc.,* 501 F.2d 1120, 1123 (9th Cir. 1974), the funding party "was led to expect profit as the result of [borrower's] efforts" in completing certain anticipated transactions.

In *El Khadem,* 494 F.2d at 1229, the lender's risk of loss varied from year to year, depending on "the skill with which [borrower] conducted its business ventures and managed [the lender's funds]."

In *SEC v. Glenn W. Turner Enterprises, Inc.,* 474 F.2d 476, 482 (9th Cir. 1973), participants

banks in commercial loan transactions are not securities. *City National Bank v. Vanderboom,* 290 F.Supp. 592, 608 (W.D.Ark. 1968), aff'd 422 F.2d 221 (8th Cir.), *cert. denied* 399 U.S. 905, 90 .S.Ct. 2196, 26 L.Ed.2d 560 (1970); *C. N. S. Enterprises, supra; Bellah v. First National Bank,* 495 F.2d 1109 (5th Cir. 1974); *McClure, supra; United States v. Koenig,* 388 F.Supp. 670 (S.D.N.Y.1974); *Avenue State Bank v. Tourtelot,* 379 F.Supp. 250 (N.D.Ill.E.D. 1974).

As the trial court noted in *McClure,* the reality of commercial bank lending is "totally unrelated to the abuses involving 'trading for speculation or investment,' which abuses Congress in 1934 sought to eliminate." [citing *Joiner, supra,* 320 U.S. at 351, 64 S.Ct. at 120, 88 L.Ed. at 93]. 352 F.Supp. 454, 458 (N.D.Tex.1973), aff'd 497 F.2d 490 (5th Cir. 1974), *cert. denied* 420 U.S. 930, 95 S.Ct. 1132, 43 L.Ed.2d 402 (1975). *Compare Investment Company Institute v. Camp,* 401 U.S. 617, 91 S.Ct. 1091, 28 L.Ed.2d 367 (1971), note 2 *infra.*

There is no indication that Congress sought to include commercial financing within the protection of the securities acts. Professor Loss comments that "[I]t might be argued that Congress would have been more explicit if it had intended to provide a federal civil remedy in the context of the ordinary promissory note." 1 Loss, Securities Regulation 546 (1961). *See also Lino v. City Investing Co.,* 487 F.2d 689, 695 (3d Cir. 1973); *Bellah v. First National Bank,* 495 F.2d 1109, 1114 (5th Cir. 1974).

While the securities acts are designed to protect "investors," commercial loans given by banks are not generally "investments"

in a pyramid sales scheme were found to be security holders, since they invested their funds in a common scheme dependent for success directly upon the collective sales efforts of the organization.

1. *Young v. Seaboard Corp.,* 360 F.Supp. 490 (D.Utah 1973), held that notes given for bank loans were securities. The reasoning of the court is far from clear and properly criticized by the Fifth Circuit in *Bellah v. First National Bank,* 495 F.2d 1109, 1115 (5th Cir. 1974), for failing to recognize the distinction between commercial and investment transactions.

and banks engaged in transactions such as this are not "investors" within the meaning of these acts. It should be noted that Congress has explicitly distinguished the investing from the lending activities of national banks, 12 U.S.C. §§ 24 and 301, and state banks which are members of the Federal Reserve, 12 U.S.C. § 335. *See also* 12 C.F.R. § 7.1180 (1974).

The investment transactions of such banks are strictly limited to a defined set of "investment securities" whose parameters would not include a note given in a commercial lending transaction, 12 U.S.C. § 24. The Comptroller of the Currency defines "investment security" as "a *marketable obligation* in the form of a bond, note, or debenture which is commonly *regarded as an investment security.*" 12 C.F.R. § 1.3(b) (1974). (Emphasis added.)[2]

The note in question here certainly cannot be held to be a "marketable obligation . . . commonly regarded as an investment security." The dichotomy in the banking regulations between lending and investing functions belies any suggestion that such notes are "investment securities."

The regulations governing Arizona savings banks pose an even stricter dichotomy between banks' lending and investing functions:

A savings bank may invest its capital and deposits and the income derived therefrom:

.     .     .     .     .

In other *listed* bonds, notes, and debentures which have a standard rating above the first four grades if the investment is approved in writing by at least two-thirds of the directors of the bank and the superintendent of banks.

A.R.S. § 6–322 (1974 Supp.) (Emphasis added.)

Such restrictions reinforce the distinction between the commercial lending and investment functions of banks. *See Sanders, supra,* 463 F.2d at 1080; *C. N. S., supra,* 508 F.2d at 1362; *Bellah, supra,* 495 F.2d at 1113. *Cf. Zabriskie, supra,* 507 F.2d at 551 (individual investor distinguished from bank which is in business of making loans).

The distinction made by Congress between commercial lending transactions and those involving investment securities is a reasonable one. While banks are subjected to risks of misinformation, their ability to verify representations and take supervisory and corrective actions places them in a sig-

---

2. *Compare* A.R.S. § 44–3002 (1974 Supp.).

In a complex action challenging the statutory authority of the Comptroller of the Currency to allow banks to engage in the investment banking business, the district court of the District of Columbia was confronted with the Comptroller's argument that "securities," as used in 12 U.S.C. § 24, has a different meaning than "securities" as used in the Securities Act of 1933, 15 U.S.C. § 77b(1). Rejecting this contention, the court stated:

"It would be inconsistent to conclude that Congress did not intend to obtain the equivalent meaning for the term 'securities' as used in the Securities Act of 1933 when it used the same term in the Glass-Steagall Act [12 U.S.C. § 24] which was enacted by the same Congress."

*Investment Company Institute v. Camp,* 274 F.Supp. 624, 642–43 (D.D.C.1967) (footnote omitted).

The decision of the district court was reversed by the Court of Appeals, *National Ass'n of Securities Dealers v. Securities & Exchange Comm'n,* 136 U.S.App.D.C. 241, 420 F.2d 83 (1969), but was subsequently affirmed by the Supreme Court. *Investment Company Institute v. Camp,* 401 U.S. 617, 91 S.Ct. 1091, 28 L.Ed.2d 367 (1971). While not expressly addressing the issue resolved by the district court, the Supreme Court did comment:

"[T]here is nothing in the phrasing of either § 16 [12 U.S.C. § 24] or § 21 [12 U.S.C. § 378(a)] that suggests a narrow reading of the word 'securities.' To the contrary, the breadth of the term is implicit in the fact that the antecedent statutory language encompasses not only equity securities but also securities representing debt."

401 U.S. at 635, 91 S.Ct. at 1101, 28 L.Ed.2d at 380. (This broad definition parallels those in 15 U.S.C. § 77b(1) and § 78c(a)(10).)

Having made this determination, the *Investment Company Institute* Court then stated that Congress had intended to "divorce" commercial banking from " 'buying and selling securities acquired purely for investment or speculative purposes.' " 401 U.S. at 635, 91 S.Ct. at 1101, 28 L.Ed.2d at 381, *quoting* Hearings Pursuant to S.Res. 71 before a Subcommittee of the Senate Committee on Banking and Currency, 71st Cong., 3d Sess., 1057 (1931).

nificantly different posture than the investors sought to be protected through the securities acts.

In an investment situation, the issuer has superior access to and control of information material to the investment decision. Rather than relying solely on semi-anonymous and secondhand market information, as do most investors, the commercial bank deals "face-to-face" with the promissor. The bank has a superior bargaining position and can compel wide-ranging disclosures and verification of issues material to its decision on the loan application. The bank here obtained a covenant to permit it to inspect Artko's property and records "at such times as [Great Western] may reasonably request." Far from purchasing an instrument whose terms were fixed prior to the time of its offering, the bank negotiated the terms of the note in question. When it discovered a change in Artko's financial status, it was able to negotiate new terms and restrictions on Artko's dealings.