**HOME GUARANTY INSURANCE CORPORATION**

v.

**THIRD FINANCIAL SERVICES, INC., and Peoples Federal Savings and Loan Association.**

No. 3–86–0869.

United States District Court, M.D. Tennessee, Nashville Division.

Aug. 19, 1987.

Boult, Cummings, Conners & Berry, Robert S. Patterson, Patricia Head Moskal, Nashville, Tenn., Raymond F. Scannel, Sr., Warren E. Zirkle, Robert T. Billingsley, McGuire, Woods & Battle, Richmond, Va., for plaintiff.

H. Naill Falls, Jr., Katherine Simpson Allen, Farris, Warfield & Kanaday, Nashville, Tenn., for Third Financial Services, Inc.

Wallace Dietz, Nashville, Tenn., William G. Merchant, Papernick & Gefsky, P.C., Pittsburgh, Pa., for Peoples Federal Sav. and Loan Ass'n.

## MEMORANDUM

WISEMAN, Chief Judge.

This is a civil action in which the plaintiff Home Guaranty Insurance Corporation (HGIC) seeks to rescind its mortgage insurance policies on the grounds of material misrepresentations and omissions made in the applications for insurance. Defendant, Third Financial Services (Third), the originator of certain mortgage loans, has sold and assigned these mortgage loans and accompanying mortgage guarantees to defendant Peoples Federal Savings & Loan Association (Peoples). In Count VI of its Counterclaim, Peoples alleges violations by HGIC of federal securities laws under Section 17(a) of the Securities Act of 1933, as amended, 15 U.S.C. § 77q(a); Section 10 of the Securities Exchange Act of 1934, 15 U.S.C. § 78j, and Rule 10b–5 promulgated thereunder, 17 C.F.R. § 240.10–b–5.

The determinative issue for the purpose of this motion is whether these mortgage loans and guarantees, taken together, are "securities" under the federal statutes.

When ruling on a motion to dismiss, a court must take as admitted the material allegations of the claim and must construe the claim liberally in favor of the claimant. *Jenkins v. McKeithen*, 395 U.S. 411, 421, 89 S.Ct. 1843, 1848, 23 L.Ed.2d 404 (1969). In this case, the counterclaim at issue rests upon the following facts.

## I. Factual Background

In June 1982 HGIC executed and issued to Third a "Master Policy" providing 100 percent mortgage insurance coverage for mortgage loans originated by Third. In December 1982, Third submitted to Peoples a proposal for financing a townhouse project consisting of nine townhouse units located in Destin, Florida, and known as the "Shoreline Gardens Townhomes" (Shoreline Phase I). Under this proposal Third would loan the sum of $1,485,000.00 to a Georgia limited partnership known as Shoreline Gardens Townhomes II, Ltd., which loan would be secured by nine first mortgages on the respective townhouse units. Third further proposed that these mortgage loans, to be purchased by Peoples, would be serviced by Third and would enjoy 100 percent private mortgage insurance provided by HGIC. In January 1983 HGIC, being aware of the ongoing negotiations between Peoples and Third for the purchase of Shoreline Phase I, reviewed and approved the applications of Third for private mortgage insurance and issued nine individual commitments/certificates to Third. In January 1983 Third closed the Shoreline Phase I mortgage loans with the borrower. In February 1983 these mortgage loans were sold and assigned by Third to Peoples, along with the mortgage insurance issued by HGIC on these loans.

During this period Third was also negotiating the sale of Shoreline Phase II to Peoples. Phase II comprised 12 additional units. Peoples agreed in February, 1983 to purchase from Third the construction/permanent mortgage loans on these 12 additional units with the proviso that HGIC issue mortgage insurance on these loans.

In April 1983 Third closed the construction loan with the borrower in the amount of $2,500,000; this loan was collaterized by 12 individual mortgages on these units. In the meantime HGIC provided mortgage insurance on each loan; the sale by Third to Peoples of the construction/permanent mortgage loans on Phase II was closed in August 1983.

In December 1984 the Borrower defaulted on the Phase I and Phase II mortgage loans; Peoples instituted foreclosure proceedings against the Borrower in the Circuit Court of Okaloosa County in Florida. The foreclosure sale resulted in Peoples assuming title to the 21 units in March 1986. Subsequently, Peoples submitted the titles of the 21 units to HGIC along with 21 claims for loss in the amount of $4,805,-356.86. HGIC refused to pay; on October 8, 1986 it filed an action in this Court for a declaratory judgment seeking to rescind the insurance certificates based on its view that Third made material factual misrepresentations in its applications for mortgage insurance coverage, thus rendering the insurance certificates on Phase I and Phase II void.

Accompanying its Answer, Peoples made a seven-count counterclaim against HGIC. Before the Court at this juncture is HGIC's rule 12(b)(6) motion to dismiss Peoples' federal claims (Count VI) alleging violations of the anti-fraud provisions of the Securities Act of 1933, the Securities Exchange Act of 1934 and Rule 10b–5. Peoples argues that it was induced by HGIC's mortgage insurance coverage to purchase the Shoreline Loan Packages from Third, and that HGIC in effect operated as a broker for the mortgage loan packages.

## II. Discussion

■ In order for this Court to reach the question of an alleged violation of the anti-fraud provisions of the Securities Acts, the transaction at issue must involve a "security" as defined in either the 1933 and 1934 Acts. Section 2(1) of the 1933 Act provides:

When used in this subchapter, unless the context otherwise requires—

(1) The term "security" means any note, stock, treasury stock, bond, debenture, evidence of indebtedness, certificate of interest or participation in any profit-sharing agreement, collateral-trust certificate, preorganization certificate or subscription, transferable share, investment contract, voting-trust certificate, certificate of deposit for a security, fractional undivided interest in oil, gas, or other mineral rights, or in general, any

interest or instrument commonly known as a "security," or any certificate of interest or participation in, temporary or interim certificate for, receipt for, guarantee of, or warrant or right to subscribe to or purchase, any of the foregoing. 15 U.S.C. § 77b(1).

Although Section 3(a)(10) of the 1934 Act, 15 U.S.C. § 78c(a)(10), has been read by the Supreme Court to be "virtually identical" to Section 2(1) of the 1933 Act, *Tcherepnin v. Knight,* 389 U.S. 332, 335-36, 88 S.Ct. 548, 552-53, 19 L.Ed.2d 564 (1967), there are, however, two differences. First, the 1934 Act definition deletes the term "evidence of indebtedness." Second, the language of Section 3(a)(10) excludes from the 1934 Act definition of "security" the following: "any note, draft, bill of exchange, or banker's acceptance which has a maturity at the time of issuance of not exceeding nine months, exclusive of days of grace, or any renewal thereof the maturity of which is likewise limited."

Although these statutes plainly enumerate a list of instruments, this list has not been dealt with literally by the courts. The Supreme Court, stressing that the intent of Congress in enacting the securities laws was the protection of investors, has generally favored the notion that the courts broadly construe the Acts,[1] disregard form

for substance, and emphasize the economic realities of a transaction in determining whether an instrument, regardless of the name given to it,[2] is a "security."

As a result, courts generally have taken a broad approach to the statutory wording and used the "flexible" principle outlined in *Howey* to examine the "substance" or "economic reality" of all alleged securities transactions without relying solely on the particular form of the instrument in order to determine whether a transaction falls within the purview of the Act.[3]

This process began with the Supreme Court's definition of an "investment contract":

> [A]n investment contract for purposes of the Securities Act means a contract, transaction, or scheme whereby a person [1] invests his money [2] in a common enterprise and [3] is led to expect profits solely from the efforts of the promoter or a third party, it being immaterial whether the shares in the enterprise are evidenced by formal certificates or by nominal interests in the physical assets employed in the enterprise.

*Howey,* 328 U.S. at 298, 66 S.Ct. at 1102.

This definition, known as the *"Howey* test," was later used by many courts to define a "security" in general.[4] Not until

---

1. In *Tcherepnin, supra,* 389 U.S. at 336, 88 S.Ct. at 553, the Court, referring to *S.E.C. v. W.J. Howey Co.,* 328 U.S. 293, 298, 66 S.Ct. 1100, 1102, 90 L.Ed. 1244 (1946), stated:

   In addition, we are guided by the familiar canon of statutory construction that remedial legislation should be construed broadly to effectuate its purposes. The Securities Exchange Act quite clearly falls into the category of remedial legislation. One of its central purposes is to protect investors through the requirement of full disclosure by issuers of securities, and the definition of security in section 3(a)(1) necessarily determines the classes of investments and investors which will receive the Act's protections. Finally, we are reminded that, in searching for the meaning and scope of the word "security" in the Act, form should be disregarded for substance and the emphasis should be on economic reality.

2. In *United Housing Foundation, Inc. v. Forman,* 421 U.S. 837, 850, 95 S.Ct. 2051, 2059, 44 L.Ed.2d 621 (1975), the Court stated:

   In holding that the name given to an instrument is not dispositive, we do not suggest that the name is wholly irrelevant to the decision whether it is a security. There may be occasions when the use of a traditional name such as "stocks" or "bonds" will lead a purchaser justifiably to assume that the federal securities laws apply.

3. Guided by the reasoning in *Tcherepnin,* 389 U.S. at 342, 88 S.Ct. at 556, courts in broadly construing the Acts have in effect narrowed the short-term note exclusion in the 1934 Act. *See, e.g., Bellah v. First Nat'l Bank of Hereford,* 495 F.2d 1109, 1111 (5th Cir.1974); *Sanders v. John Nuveen & Co., Inc.,* 463 F.2d 1075, 1080 (7th Cir.), *cert. denied,* 409 U.S. 1009, 93 S.Ct. 443, 34 L.Ed.2d 302 (1972), *Zeller v. Bogue Electric Manufacturing Corp.,* 476 F.2d 795, 800 (2d Cir. 1973).

4. *See Forman,* 421 U.S. at 842, 95 S.Ct. at 2055; *Tcherepnin,* 389 U.S. at 336, 88 S.Ct. at 553; *Union Planters National Bank v. Commercial Credit Business Loans, Inc.,* 651 F.2d 1174, 1180

recently did the Supreme Court reveal any inclination to constrain the "economic reality" approach. In this recent development, the Court took a "characteristics of the instrument" approach to a statutory category in the Acts, warning against universal application of the *Howey* test to determine whether a particular instrument "fits within *any* of the examples listed in the statutory definition of a security." *See Landreth Timber Co. v. Landreth*, 471 U.S. 681, 691, 105 S.Ct. 2297, 2305, 85 L.Ed.2d 692 (1985) (emphasis original). Although the *Landreth* Court applied the new approach only to the term "stock," it expressly left open the question of what other instruments listed in the Acts, including notes, are to be governed by a "characteristics of the instrument" approach.[5] In light of the above and of the fact that the transaction at issue involves mortgage notes, this Court has examined the issue in this case using both an "economic reality" and a "characteristics of the instruments" approach.

### A. Analysis as a "Note"

In assessing the economic realities of a note transaction, the United States Circuit Courts of Appeal have devised somewhat different approaches for determining whether a note transaction involves a "security."

An approach that draws a distinction between "investment" and "commercial" notes has been followed in the First, Third, Fifth, Seventh and Tenth Circuits. This approach is premised on the view that Congress' concern in enacting the securities laws was with practices associated with "investment" transactions, and that the securities laws were not designed to regulate "commercial" transactions. *See C.N.S. Enterprises, Inc. v. G. & G. Enterprises, Inc.*, 508 F.2d 1354, 1359 (7th Cir.), *cert. denied*, 423 U.S. 825, 96 S.Ct. 38, 46 L.Ed.2d 40 (1975). Under the investment-commercial dichotomy notes are deemed to be of an "investment" character if:

(1) the assets acquired in exchange for the notes are of the character of "investment assets"; (2) the issuance, purchase, and sale of notes are made by persons not normally in the business of entering into the underlying type of transaction; and (3) the note creates a long term indebtedness.

*See S.E.C. v. Diversified Industries*, 465 F.Supp. 104, 108–09 (D.D.C.1979); *Bellah, supra*, 495 F.2d at 1111; *McClure v. First Nat'l Bank*, 497 F.2d 490 (5th Cir.1974), *cert. denied*, 420 U.S. 930, 95 S.Ct. 1132, 43 L.Ed.2d 402 (1975).

The Second Circuit, following a "literalist" approach that in many ways has presaged the Supreme Court's approach to the term "stock" in *Landreth*, has articulated two interrelated formulations. First, there is a presumption that anti-fraud coverage under both Acts is afforded to "any note" exceeding nine months maturity "unless the context otherwise requires" (the context referred to being that of the transaction rather than of the text of the statute). Second, certain categories of ordinary commercial transactions, including consumer financing, notes secured by mortgages on homes, short-term notes secured by liens on businesses, and assignments of accounts receivable are excepted from the presumption and are not to be considered "securities" under both Acts. *See Exchange National Bank v. Touche Ross & Co.*, 544 F.2d 1126 (2d Cir.1976); *Movielab, Inc. v. Berkey Photo, Inc.*, 452 F.2d 662 (2d Cir. 1971).

The Sixth Circuit has adopted the "risk capital" approach of the Ninth Circuit, which posited six factors to be considered in determining whether a "note" transaction is an "investment." *See Union Planters, supra*, at 1181–82; *United California Bank v. THC Financial Corp.*, 557 F.2d 1351 (9th Cir.1977); *Great Western Bank & Trust v. Kotz*, 532 F.2d 1252 (9th Cir.1976). The six factors are (1) time; (2) collateralization; (3) form of the obligation; (4) circumstances of issuance; (5) relationship between the amount borrowed and the

(6th Cir.), *cert. denied*, 454 U.S. 1124, 102 S.Ct. 972, 71 L.Ed.2d 111 (1981).

5. *See Landreth*, 471 U.S. at 694, 105 S.Ct. at 2306.

size of the borrower's business; and (6) the borrower's contemplated use of funds. *United California Bank,* 557 F.2d at 1358.

■ Applying the Sixth Circuit approach in this case, the mortgage packages at issue are 30 year loans. Time is an important factor because the longer one's funds are to be used by another, the greater can be the risk of loss. This factor alone, however, is not dispositive. *Great Western, supra,* 532 F.2d at 1257–58. The second factor is collateralization—important because lack of collateral may imply dependence of the unsecured lender on the efforts of a third party. This transaction reflects sizable collateral—the condominium project.

Next, the form of this obligation was mortgage notes. These were the circumstances of issuance: Third is a banking institution in the business of providing commercial loans; Peoples is a savings and loan association in the business of providing mortgage loans; and HGIC is an insurance company in the business of underwriting mortgage insurance policies. The sequence of events in this transaction and its economic realities were as follows: Before originating the Shoreline mortgage loans to the borrower/developer, Third submitted a proposal to Peoples for its review and approval. Peoples' approval of these loans was in turn contingent on HGIC's approval and on issuance of the mortgage insurance certificates. Thus, each party had a distinct causal effect on the origination of these loans. In reality, each of the three parties became an impetus for and an active participant in the loan origination.

The fifth and sixth factors are the relationship between the amount borrowed and the borrower's business, and the contemplated use of the proceeds. It is true that this was a relatively large loan that financed an entire condominium project; but it was a secured loan on a project in which a determined interest note was the only contemplated return. There were no other

anticipated profits. *See Union Planters* at 1184.

Taken together, the elements of the risk-capital approach lead the Court to the conclusion that this undertaking was "commercial" rather than "investment" in character. The Court places special emphasis on the face-to-face aspects of its origination, the traditional mortgage-loan form of the underlying notes, their collateralization and the nature of the contemplated return. *See American Bank & Trust Co. v. Wallace,* 702 F.2d 93, 96 (6th Cir.1983).

Similarly, the Court concludes that Peoples' experience in mortgage lending and its face-to-face involvement in the negotiation of these instruments would result in their characterization as "commercial" rather than "investment" notes. *See Kotz, supra,* 532 F.2d at 1262; *cf. Marine Bank v. Weaver,* 455 U.S. 551, 560 & n. 10, 102 S.Ct. 1220, 1225 n. 10, 71 L.Ed.2d 409 (1982). The Shoreline Loan Packages may have been "risky loans," but they were not necessarily "risk capital." *Kotz,* 532 F.2d at 1257.

■ Nor would these instruments be classed as securities in the Second Circuit, bearing as they do a strong "family resemblance" to a "note secured by a mortgage on a home," one of Judge Friendly's categories that are excluded from the presumption otherwise applicable to "any note." *See Exchange National Bank, supra,* 544 F.2d at 1137–38.

Thus, the Court concludes that the Shoreline loan packages, treated as a "note" for purposes of statutory interpretation, are not securities under either the 1933 or 1934 Acts.[6]

## B. The Howey Test

■ As discussed *supra,* the Supreme Court's opinion in *Landreth* suggests caution should be exercised in insisting upon application of the full three-part *Howey* test to all transactions, including notes. *See Landreth,* 471 U.S. at 691–94, 105 S.Ct.

---

6. Whether a note is of a "commercial" or "investment" nature would be entirely dispositive under a "characteristics of the instrument" approach, but would represent only the first of three steps under the full *Howey* analysis.

at 2304–06. In *Union Planters, supra,* decided four years before *Landreth,* the Sixth Circuit applied the full *Howey* test to a loan participation. To the extent this approach of *Union Planters* remains unambiguously binding in light of the caution subsequently suggested in *Landreth,* this Court concludes that the instruments here cannot be securities. Neither the requirement of horizontal commonality,[7] *Union Planters* at 1183, nor of an expectation of profits derived solely from the efforts of others is satisfied. It is difficult to see how the service contract which Third was to perform rises to the level of entrepreneurial effort by another, as the *Howey* approach contemplates. *See Union Planters* at 1185. Indeed, far from depending solely upon the efforts of Third and HGIC, Peoples appears to have played an active role as a mortgage lender and to have taken active and knowledgeable steps to attempt to reduce its own risk.[8] The securities laws are "not a panacea for commercial loans gone awry." *Union Planters,* 651 F.2d at 1185.

Having decided that the instruments at issue are not securities, the Court has no occasion to address the other securities law issues raised by the parties, including the existence of a private right of action under section 17(a) of the 1933 Act and the standard for aiding and abetting liability under section 10(b) of the 1934 Act.

For the reasons stated above, HGIC's motion to dismiss Count VI of the counterclaim is granted.

### ORDER

For the reasons stated in the accompanying Memorandum, HGIC's motion to dismiss Count VI of the Counterclaim by Peoples is granted. For the reasons stated from the bench, the motion to dismiss the

counterclaim by Peoples seeking "bad faith" liability under Pennsylvania law (Count VII) also was granted; and HGIC's motions to dismiss the negligence and misrepresentation counterclaims (Counts IV and V) were denied.

---

7. *See also Exchange National Bank,* 544 F.2d at 1136 ("the (*Howey*) test seems to us to be of dubious value in (the note) context").

8. Peoples' reliance on *First Federal Savings & Loan Assoc. of Miami v. Mortgage Corp. of the South,* 467 F.Supp. 943 (D.C.Ala.), *aff'd,* 650 F.2d 1376 (5th Cir.1981) is misplaced. The major difference from the case at bar is that, unlike here, First Federal's purchase of the "mortgage notes" from Mortgage Corp. followed and was unrelated to the loan origination. Had Peoples been an arms-length purchaser of Third's mortgage notes without its interwoven relationship to the loan origination, the Court then would be faced with a different "economic reality."