**DEVELOPER'S MORTGAGE
COMPANY, Plaintiff,**

v.

**TRANSOHIO SAVINGS
BANK, Defendant.**

No. C–2–88–0034.

United States District Court,
S.D. Ohio, E.D.

Feb. 14, 1989.

**572**

Edward V. Miller, Columbus, Ohio, for plaintiff.

S. Ronald Cook, Jr., Porter, Wright, Morris & Arthur, Columbus, Ohio, for defendant.

1. 15 U.S.C. § 77*l* (1982). This allegation appears in Count II of the Complaint.

2. 15 U.S.C. § 77q (1982). This allegation appears in Count III of the Complaint.

3. 17 C.F.R. § 240.10b–5 (1987). This claim appears in Count III of the Complaint.

4. 18 U.S.C. §§ 1961(1), (5), 1962 (1982 & West Supp.1988). The RICO allegations appear in Counts XIII and XIV.

5. Counts I and XV are allegations of fraudulent misrepresentation. In Count IV, the plaintiff

## OPINION AND ORDER

KINNEARY, District Judge.

This matter comes before the Court to consider the motion of the defendant, TransOhio Savings Bank ("TransOhio"), for dismissal for failure to state claims upon which relief can be granted, Fed.R. Civ.P. 12(b)(6). The plaintiff, Developer's Mortgage Co. ("DMC"), alleges that the defendant violated sections 12(2)[1] and 17(a)[2] of the Securities Act of 1933, Rule 10b–5 under the Securities Exchange Act of 1934,[3] and the Racketeer Influenced and Corrupt Organizations Act ("RICO").[4] In addition, the plaintiff set out a number of state law claims.[5]

These violations allegedly occurred when the defendant's predecessor sold the plaintiff a participation in a loan that it had made to Jack and Geraldine Sowles ("Sowles") for the purpose of purchasing land in Houston and of constructing twenty buildings on the land pursuant to a project known as Harlequin Square ("the Project"). That is, DMC paid the defendant a percentage of the value of the loan in exchange for the right to receive a portion of the payments from Sowles in proportion to the percentage DMC paid. The defendant's predecessor, Dollar Savings Bank, merged with TransOhio at a time after it had signed the Loan Participation Sale and Trust Agreement ("Sale and Trust Agreement") with the plaintiff.[6]

The Sale and Trust Agreement simply provides for the sale of "participating ownership interests" in loans to be named in attached "Participation Certificates." In the DMC–TransOhio Sale and Trust Agreement, the parties incorporated only one Participation Certificate, the one which per-

alleges negligent, wanton, and reckless misrepresentation. Counts V and XI are allegations of breach of fiduciary duty. Finally, Counts VI, VII, VIII, IX, X, XI, and XII present claims for breach of contract.

6. For the sake of clarity, the Court will refer to both the Dollar Savings Bank and TransOhio as "TransOhio" or "the defendant" to avoid any confusion arising from the change in entities caused by the merger.

tained to the Sowles loan. Through the Sale and Trust Agreement and the Participation Certificate, then, TransOhio transferred to DMC a participation in the Sowles loan.

The plaintiff now disputes the particulars of the procedures to be followed pursuant to the parties' agreement in the event Sowles defaulted. According to the Complaint, the defendant represented during negotiations that it had arranged for a Stand–By Permanent Take Out Loan ("Take–Out Loan") for Sowles. The Take–Out Loan would permit Sowles to pay the plaintiff any of the remaining balance due to it if Sowles could not "market the project." *See* Complaint at 2–4. The plaintiff claims that the Take–Out Loan did not adequately protect its interests and that the defendant had no intention to invoke the Take–Out Loan's protection on behalf of the plaintiff. It lists a number of misrepresentations in connection with the deal and with the Take–Out Loan. After the Project turned sour and the defendant refused to liquidate, the plaintiff filed this suit.

The defendant now moves for dismissal for three reasons. First, the defendant claims that the plaintiff's participating ownership interest in the loan was not a "security" within the meaning of the Securities Act of 1933 ("the '33 Act") and the Securities Exchange Act of 1934 ("the '34 Act"). Therefore, it contends that Counts II and III fail to state a claim upon which relief can be granted under sections 12(2) and 17(a) of the '33 Act and Rule 10b–5 under the '34 Act. Second, the defendant argues that Counts XIII and XIV fail to state a claim under RICO since the plaintiff failed to allege a "pattern of racketeering activity," a requirement under RICO. Finally, the defendant asserts that the Court should dismiss the remaining Counts, since they are based solely on state law. With no independent basis for federal jurisdic-

tion, the defendant urges the Court to refrain from invoking pendent jurisdiction.

In its reply brief, the plaintiff claims that the Sale and Trust Agreement and the Participation Certificate representing DMC's participation ownership interest in the Sowles loan were indeed "securities" which were involved in this transaction. It did not mention the participation ownership interest itself, although the Complaint mentions only the participation as the alleged "security." The Court will consider the possibility of whether any of these three items were "securities."

Moreover, the plaintiff contends that it does allege a "pattern of racketeering activity" by setting forth claims of multiple criminal episodes of fraud; TransOhio allegedly defrauded Hollywood Federal Savings and Loan Association as well as DMC. Finally, the plaintiff urges the Court to invoke pendent jurisdiction, since it posits that it successfully alleges claims under the securities laws and RICO, independent bases for federal jurisdiction.

The Court will address each of the issues raised by the defendant in turn: (1) whether Complaint successfully alleges that the transaction involved a "security" within the meaning of the securities laws; (2) whether the Complaint alleges a pattern of racketeering activity to satisfy RICO; and (3) whether the Court should exercise pendent jurisdiction over the plaintiff's state claims.

## I. DEFINING A "SECURITY"

In order to prove a violation of the securities laws, the plaintiff must show that a "security" was involved; and in order to ascertain whether the transaction involved a "security," the Court must turn first to the language of the relevant statutes, *International Bhd. of Teamsters v. Daniel*, 439 U.S. 551, 558, 99 S.Ct. 790, 795, 58 L.Ed.2d 808 (1979).

Under section 2(1) of the '33 Act, the definition of a security is quite broad. 15 U.S.C. § 77b(1) (1982).[7] The statute states

---

7. Section 2(1) provides that "unless the context otherwise requires," a security is:

 *any note,* stock, treasury stock, bond, debenture, evidence of indebtedness, certificate of

interest or participation in any profit-sharing agreement, collateral-trust certificate, preorganization certificate or subscription, transferable share, investment contract, voting-

that the definition of "security" encompasses "any note ... or any ... participation in" a note. *Id.* The broad definition of "security" in section 3(a)(10) of the '34 Act contains the same language. 15 U.S.C. § 78c(a)(10) (1982).[8] In fact, the definitions of "security" in the two acts are "virtually identical," *Tcherepnin v. Knight*, 389 U.S. 332, 336, 88 S.Ct. 548, 553, 19 L.Ed.2d 564 (1967); and the Court will read both statutes to define "security" in the same way, *see, e.g., Landreth Timber Co. v. Landreth*, 471 U.S. 681, 686 n. 1, 105 S.Ct. 2297, 2301 n. 1, 85 L.Ed.2d 692 (1985).

### A. *Analysis of the Statutory Language*

In order to support the claim that the Sale and Trust Agreement and the Participation Certificate are "securities," the plaintiff relies on the statutory language. Since the statutes include "any note ... or any ... participation in" a note, the plaintiff argues that the two documents are, "ipso facto," "securities." For support, the plaintiff reads *Landreth Timber Co. v. Landreth*, 471 U.S. 681, 105 S.Ct. 2297, 85 L.Ed.2d 692 (1985), to hold that if the name of the instrument is contained in the statutes' list of kinds of securities, then the instrument must be a "security."

This argument fails for two reasons. First, the language "any note ... or any ... participation" encompasses only the participation itself, not the documents which transfer the participating ownership interest from a purchaser to a seller: in this case, the Sale and Trust Agreement and the Participation Certificate.[9] Therefore, this language does not, by itself, bring these two instruments within the definition of a "security."

Second, the plaintiff misread *Landreth*. The *Landreth* Court noted that the fact that the instruments in question might bear a label included in the statutory list does not make them "securities" per se. *See id.* at 686, 105 S.Ct. at 2301.[10] Instead, this Court must determine whether the instruments in question "possess 'some of the significant characteristics typically associated with'" those instruments of the same name which are, in fact, "securities." *Id.* After all, the parties to a transaction could name an instrument anything, such as "stock" or some other label traditionally associated with securities, whether or not such a label corresponds with the true

---

trust certificate, certificate of deposit for a security, fractional undivided interest in oil, gas, or other mineral rights, any put, call, straddle, option, or privilege on any security, certificate of deposit, or group or index of securities (including any interest therein or based on the value thereof), or any put, call, straddle, option, or privilege entered into on a national securities exchange relating to foreign currency, or, in general, any interest or instrument commonly known as a "security," *or any* certificate of interest or *participation in,* temporary or interim certificate for, receipt for, guarantee of, or warrant or right to subscribe to or purchase, *any of the foregoing. Id.* (emphasis added).

**8.** Section 3(a)(10) provides that "unless the context otherwise requires," a security is:

*any note,* stock, treasury stock, bond, debenture, certificate of interest or participation in any profit-sharing agreement or in any oil, gas, or other mineral royalty or lease, any collateral-trust certificate, preorganization certificate or subscription, transferable share, investment contract, voting-trust certificate, certificate of deposit, for a security, any put, call, straddle, option, or privilege on any security, certificate of deposit, or group or index

of securities (including any interest therein or based on the value thereof), or any put, call, straddle, option, or privilege entered into on a national securities exchange relating to foreign currency, or in general, any instrument commonly known as a "security"; *or any* certificate of interest or *participation in,* temporary or interim certificate for, receipt for, or warrant or right to subscribe to or purchase, *any of the foregoing;* but shall not include currency or any note, draft, bill of exchange, or banker's acceptance which has a maturity at the time of issuance of not exceeding nine months, exclusive of days of grace, or any renewal thereof the maturity of which is likewise limited.

*Id.* (emphasis added).

**9.** The Court, however, will consider the possibility that these two documents could fit within the plain statutory text as members of the set of "investment contracts," an enumerated type of security within the statute.

**10.** The *Landreth* court stated that the mere inclusion of the word "stock" within the statutory list of examples of securities "is not of itself sufficient to invoke the coverage of the [1933 and 1934] Acts." *Id.*

characteristics of the instrument.[11] *See United Housing Found., Inc. v. Forman,* 421 U.S. 837, 95 S.Ct. 2051, 44 L.Ed.2d 621 (1975). Accordingly, the name which the parties bestow upon an obligation is not dispositive of its possible status as a "security." [12]

Moreover, both the '33 and '34 Acts provide that the definitions are to apply only if the context does not otherwise require a different definition, 15 U.S.C. §§ 77b(1), 78c(a)(10) (1982). *Union Planters Nat'l Bank v. Commercial Credit Business Loans, Inc.,* 651 F.2d 1174, 1180 (6th Cir.), *cert. denied,* 454 U.S. 1124, 102 S.Ct. 972, 71 L.Ed.2d 111 (1981). The Court must read the definitions of "security" in light of the purpose of the legislation and the context. *Id.; see Landreth,* 471 U.S. at 687, 105 S.Ct. at 2302; *American Bank & Trust Co. v. Wallace,* 702 F.2d 93, 94 (6th Cir.1983).

◼ In sum, then, the Court cannot conclude that the loan participating ownership interest in the Sowles loan was a "security," solely by virtue of the language in the statutes referring to participations in notes. Nor is it possible to include as "securities" the documents which transfer the participations on the same basis. The label given to the instrument is simply not dispositive of its status as a "security."

B. *Case Law Tests for the Presence of "Securities"*

Having rejected the notion that the title given to the instruments involved controls the determination of whether an obligation is a "security," the Court must conclude that the plain language of the statutes is insufficient to reveal whether or not the instruments and obligation involved were "securities." With scant legislative history on point for guidance, the Court must turn to judicial interpretations of the statutes. Certain tests propounded in the case law provide useful approaches to resolving the issue.

Two tests have arisen as means for determining whether an instrument is a "security." First, some cases hold that it is necessary to look to the "economic realities" of the transaction, rather than its form, when considering whether the instrument in question is an "investment contract." *United Housing Found., Inc. v. Forman,* 421 U.S. 837, 848, 95 S.Ct. 2051, 44 L.Ed.2d 621 (1975); *Tcherepnin v. Knight,* 389 U.S. 332, 336, 88 S.Ct. 548, 553, 19 L.Ed.2d 564 (1967); *see also SEC v. W.J. Howey Co.,* 328 U.S. 293, 298–301, 66 S.Ct. 1100, 1102–04, 90 L.Ed. 1244 (1946). In looking at "economic realities," the Supreme Court established the so-called *Howey–Forman* test.

To establish the existence of an investment contract, the *Howey–Forman* test requires a showing of "[1] the presence of an investment [2] in a common venture [3] premised on a reasonable expectation of profits [4] to be derived from the entrepreneurial or managerial efforts of others." *Forman,* 421 U.S. at 852, 95 S.Ct. at 2060. These four conditions are, together, both

---

**11.** Professor Loss explained the problem associated with relying on the titles that the parties give to an obligation.

> A public offering of instruments that are denominated "notes" but might just as well be called "debentures" or "bonds" is clearly an offer of a "security." Else we might expect to see all debt instruments termed "notes." ... Just as clearly, the personal "note" given as a down payment on a television set is *not* a "security." Else every unsatisfactory picture tube might end up in federal court, without regard to diversity of citizenship or jurisdictional amount, as a fraudulent "purchase" of a "security" in violation of Rule 10b–5.

L. Loss, *Fundamentals of Securities Regulation* 166 (2d ed. 1988).

**12.** The plaintiff also relied on a case from the District of Utah, which stated that "if it is a facially obvious security instrument it will be *included* as a security without consideration of the underlying economic circumstances." *Bradford v. Moench,* 670 F.Supp. 920, 931 (D.Utah 1987).

If the plaintiff is advancing this proposition to prove that the Sale and Trust Agreement and Participation Certificate are "securities," then it is simply begging the question. These instruments are not facially obvious security instruments. The court went on to state that if the obligation is not a "classic security" or "within the statutory definition," then the economic realities "will be examined." *Id.; see infra* text accompanying note 13.

*sufficient* and *necessary* conditions of an "investment contract" or an "instrument commonly known as a 'security.' " [13]

Although the Sixth Circuit adopted the *Howey–Forman* test to determine whether *any* instrument is a security, *Union Planters*, 651 F.2d at 1181,[14] the Supreme Court subsequently repudiated this broad application of the test. It held that the *Howey–Forman* test applied only when determining whether a particular instrument is an "investment contract" or an "instrument commonly known as a 'security.' " [15] *Landreth*, 471 U.S. at 691–92 & n. 5, 105 S.Ct. at 2304–05 & n. 5.

The second, subsequent test for the presence of a "security" appeared in *Landreth Timber Co. v. Landreth*, 471 U.S. 681, 105 S.Ct. 2297, 85 L.Ed.2d 692 (1985). Although not stated in these terms, *Landreth* sets down two conditions, which together are *sufficient*, but not *necessary*, for an instrument to be a "security": [16] (1) the instrument bears a title which is traditionally [17] associated with "securities"; [18] and (2) the instrument "possesses 'some of the significant characteristics typically associated with' " instruments of that title which are, in fact, "securities," *Landreth*, 471 U.S. at 686, 105 S.Ct. at 2301 (quoting *Forman* 421 U.S. at 851, 95 S.Ct. at 2060).[19]

---

**13.** This test survived the recent Supreme Court decision of *Landreth Timber Co. v. Landreth*, 471 U.S. 681, 105 S.Ct. 2297, 85 L.Ed.2d 692 (1985), when the Court indicated that application of the *Howey* test was appropriate to determine whether a particular instrument is an "investment contract" or an "instrument commonly known as a 'security.' " *Id.* at 691–92 & n. 5, 105 S.Ct. at 2304–05 & n. 5.

**14.** *See American Bank & Trust*, 702 F.2d at 95–96. *American Bank & Trust* cited the *Howey–Forman* formulation with approval merely as a means of focusing on "economic realities," but not as a general test for the presence of a "security." 702 F.2d at 96. The Court claimed that the earlier Sixth Circuit decision, *Union Planters*, had invoked the *Howey–Forman* factors for this same, limited purpose. *Id. American Bank & Trust*, in fact, states that *Union Planters* adopted the "risk capital" test, *see infra* text accompanying note 24, as the general test to determine whether the transaction involved a "security."

In actuality, the *Union Planters* court adopted the *Howey–Forman* formulation as the test for a "security." 651 F.2d at 1181. The *Union Planters* court used the "risk capital" test only to consider the possible presence of an investment, one element of the *Howey–Forman* test.

**15.** Perhaps the Supreme Court limited the application of the *Howey–Forman* test in *Landreth*, where the stock sellers attempted to use the test to exclude the case from the scope of the securities laws, because it is more willing to apply the test to include unusual instruments in the definition of securities than it is to exclude an instrument bearing the name and characteristics of a traditional security. *See Landreth*, 471 U.S. at 687–88, 105 S.Ct. at 2302–03 (a reading of the securities laws which prevented application of *Howey–Forman* to exclude certain "stock" from scope of securities laws was consistent with remedial purpose of securities laws).

**16.** The *Landreth* conditions are not together necessary conditions for an instrument to be a security because if a device does not satisfy the *Landreth* test, it still may be a "security." Such a device might be an "investment contract" or an "instrument commonly known as a 'security.' " In order to determine whether the device falls within these categories, the *Howey–Forman* test is appropriate.

**17.** The notion of tradition comes from the Court's remark concerning the label "stock" given to the instrument in question in *Forman:* the Court noted that "most instruments bearing such a traditional title are likely to be covered by the definition." *Landreth*, 471 U.S. at 686, 105 S.Ct. at 2301.

**18.** It is an open question whether all of the types of possible securities enumerated in the statute suffice as titles traditionally associated with "securities." Perhaps the set of traditional labels includes all of the types of securities listed in the statute; or perhaps the first prong of the *Landreth* test should be satisfied either by a label's traditional association with "securities" or by the inclusion of the label within the statutory list, *Bradford v. Moench*, 670 F.Supp. 920, 931 (D.Utah 1987) (indicating that the *Landreth* test is met if instrument is a "classic security" or "within the statutory definition").

The Court, however, believes that not every label enumerated in section 2(1) of the '33 Act and section 3(a)(10) of the '34 Act necessarily meets the first prong of the *Landreth* test. *See supra* notes 10–12 and accompanying text; *infra* notes 20–21 and accompanying text.

**19.** This formulation is, in a way, circular. Using the example of shares of "stock" in a cooperative, the instrument in *Forman*, the *Landreth* test would have a court determine if the instruments bear a title traditionally associated with "securities," which they do, and then to see if the shares in the cooperative possess some of

With the debut of the *Landreth* approach, the determination of whether a "security" is involved in a case becomes a two-step process. First, the Court must determine whether the alleged securities meet the two prongs of the *Landreth* test. If so, the instrument in question is a "security." If not, though, the Court must take a second step; it must apply the *Howey–Forman* test, the outcome of which would be dispositive.

## C. *Application of the Landreth Test*

Applying the *Landreth* test to the case at bar, the Court must first decide whether the "Loan Participation Sale and Trust Agreement," the "Participation Certificate," and the "participating ownership interest" bear labels which are traditionally associated with "securities," the first prong of the test.

*Landreth* held that "stock" is a traditional title. 471 U.S. at 686–87, 690, 105 S.Ct. at 2301–02, 2304. Another court held that an option to purchase "stock" warranted the same treatment as "stock." *See One–O–One Enters., Inc. v. Caruso*, 848 F.2d 1283, 1288 (D.C.Cir.1988). The Court is convinced, however, that instruments other than "stock" can carry labels traditionally associated with securities. Some instruments bear titles which are so ingrained in the traditional discourse involving securities, as "stock" is, that the Supreme Court would likely find that they too satisfied this *Landreth* condition. Perhaps the labels

the characteristics typically associated with shares of stock *which are, in fact "securities."* *Id.* In order to make this second determination, however, a court must already have some notion of what kinds of "stock" are "securities" and what kinds are not, which is the very issue to be decided.

The *Landreth* Court, examining the *Forman* example of shares of stock in a cooperative, escaped this circularity by looking to the notoriously outstanding example of stock which also happens to be a "security," common stock, and by comparing the cooperative's stock's characteristics with those of common stock. In applying the second prong of the *Landreth* test, then, a court should compare (1) the characteristics of the instrument in question, with (2) the characteristics of the one instrument of that title which, of all instruments of that name, is the best example of a "security."

"debenture" and "bond" would fall within this category.[20]

Although instruments other than stock may satisfy the *Landreth* test, the set of instruments satisfying the test may not extend far beyond "stock," if at all. The Court had explicitly reserved the question of whether "notes" or other alleged securities would deserve the same treatment as "stock," but it also emphasized that courts must consider "stock" as a unique category when determining whether the transaction in question involved a "security." In fact, *Landreth* strongly suggests that the term "note" would probably not be an instrument bearing a title traditionally associated with "securities" because of the ambiguous nature of the term. 471 U.S. at 694, 105 S.Ct. at 2306.[21] Moreover, it reinforced and elaborated upon the distinctions between "stock," which was at issue in *Landreth*, and "notes."

 In this case, the alleged securities are the Sale and Trust Agreement, the Participation Certificate, and the participating ownership interest. They involve a "loan," which entails a "note," and bear titles relating to the participation in the "loan." Given their connection with loans and notes, these titles entail the same ambiguous character as the term "note" does. Since the term "note" does not satisfy the first *Landreth* prong, the Court holds that the participating ownership interest does not satisfy it either. *Accord Home Guar.*

**20.** *See* L. Loss, *supra* note 11, at 166.

**21.** The Court seemed to reject dictum in another case, *SEC v. C.M. Joiner Leasing Corp.*, 320 U.S. 344, 355, 64 S.Ct. 120, 125, 88 L.Ed. 88 (1943), which had suggested that "notes" and "bonds" are categories listed in the statute which were standardized enough to be included within the definition of a security based on their names alone. *Landreth*, 471 U.S. at 694, 105 S.Ct. at 2306. Moreover, the Court noted that "note" was a broad term encompassing instruments with widely varying characteristics. *Id.; see supra* note 11. Therefore, the Supreme Court seems to have taken the position that the name "note" simply does not correspond to the traditional concept of "security" to the extent necessary to be considered traditionally associated with "securities." *See supra* text accompanying notes 17–18.

*Ins. Corp. v. Third Fin. Servs., Inc.*, 667 F.Supp. 577 (M.D.Tenn.1987).[22] Moreover, the two documents purporting to transfer the participation, the Sale and Trust Agreement and the Participation Certificate, bearing even more general titles, would also not satisfy this part of the *Landreth* test. In short, then, none of the alleged securities advanced by DMC merit coverage by the securities laws merely by virtue of their label and characteristics alone.[23]

### D. *Application of the Howey–Forman Test*

The failure of the Sale and Trust Agreement, the Participation Certificate, and the participating ownership interest to satisfy the *Landreth* test does not end the analysis of the transaction to ascertain the possible presence of a "security." Instead, the Court must now decide whether the three alleged securities might fall within the category of "investment contracts" or of "instruments commonly known as securities." To determine if they do, the Court must apply the *Howey–Forman* test to the purported securities. In applying this test, the Court will consider each of the elements of the test: "[1] the presence of an investment [2] in a common venture [3] premised on a reasonable expectation of profits [4] to be derived from the entrepreneurial or managerial efforts of others." *United Housing Found., Inc. v. Forman*, 421 U.S. 837, 852, 95 S.Ct. 2051, 2060, 44 L.Ed.2d 621 (1975).

### 1. Presence of an Investment

To determine the presence of an investment, the Sixth Circuit adopted the "risk capital" test presented in *Great Western Bank & Trust v. Kotz*, 532 F.2d 1252, 1257–58 (9th Cir.1976) (per curiam). The Court must consider six factors: (1) time; (2) collateral; (3) form of the obligation; (4) circumstances of issuance; (5) relationship between the amount borrowed and the size of the borrower's business; and (6) the intended use of the funds. *See Union Planters Nat'l Bank v. Commercial Credit Business Loans, Inc.*, 651 F.2d 1174, 1182 (6th Cir.), *cert. denied*, 454 U.S. 1124, 102 S.Ct. 972, 71 L.Ed.2d 111 (1981).[24] The Court will consider each factor in turn and apply them to the three alleged securities in this case: the Sale and Trust Agree-

---

**22.** The *Home Guaranty* court stated that it had considered the sale of mortgage loans in that case under both the *Howey–Forman* test and the *Landreth* test. *Id.* at 581. It concluded under both tests that the transaction in question did not involve a "security." *Id.* at 581–83 & n. 6 (none of *Howey–Forman* conditions satisfied; *Landreth* "characteristics of the instruments" approach coextensive with first *Howey* prong, presence of an investment, determined by the "risk capital" test in this Circuit; *Landreth* test not met where "risk capital" test showed the absence of an "investment").

Nevertheless, the court intimated that the *Landreth* test may not apply to transactions of the kind that it faced. It stated that although *Landreth* "suggests caution should be exercised" in applying *Howey–Forman,* the Sixth Circuit's acceptance of *Howey–Forman* in the earlier *Union Planters* "remains unambiguously binding *in light* of the caution subsequently suggested in *Landreth.*" *Id.* at 582, 583 (emphasis added). Perhaps the court meant to say that it found the *Howey–Forman* test dispositive and binding under the facts of the case *in spite* of, not *in light* of, the *Landreth* admonition because the sale did not satisfy the *Landreth* conditions.

Despite this language in *Home Guaranty,* the Court believes that both tests are always "bind-

ing," in the sense that application of both of them seriatim constitutes the two-part analysis necessary to determine if an instrument is a "security."

**23.** Even if the Sale and Trust Agreement, the Participation Certificate, and the participating ownership interest did have traditional titles, they would not satisfy the second prong of the *Landreth* test. They do not have the relevant significant characteristics typically associated with securities. *See infra* note 34.

**24.** Some cases seem to analyze a seventh factor: risk and the nature of the return to the alleged investor. If the return depended on the fortunes of the company, the obligation would more likely be a "security." If the return were fixed by contract, however, the obligation would more resemble a strictly "commercial" transaction. *See Home Guar. Ins. Corp. v. Third Fin. Servs., Inc.*, 667 F.Supp. 577, 582 (M.D.Tenn. 1987) (citing *Union Planters,* 651 F.2d at 1184). The Court does not believe that the nature of the return is another factor to be considered here, since *Union Planters* considered this only in the context of the third prong of the *Howey–Forman* test, the presence of a reasonable expectation of profits.

ment, the Participation Certificate, and the participating ownership interest.

### a. *Time*

The first *Great Western* factor is the duration in which the purported investor's money is retained. The "longer the money is held, the more probable it becomes that an investment is involved." *Union Planters*, 651 F.2d at 1182; *see Great Western*, 532 F.2d at 1257–58. The plaintiff notes that the mortgage loan to Sowles was 18 months in length. The plaintiff uses this fact to argue that the time factor necessarily weighs in favor of including the Sale and Trust Agreement and the Participation Certificate within the definition of a "security."

The plaintiff states that since 15 U.S.C. § 78c(a)(10) (1982) excludes from the definition of "security" those "notes" which are nine months or less in duration, the "negative implication" is that all notes longer than nine months in duration are securities per se.[25] This argument fails for two reasons. First, the security involved here is not a "note" but rather one or more of the instruments alleged by the plaintiff: the Sale and Trust Agreement, the Participation Certificate, or the participating ownership interest in the loan. If the plaintiff relies on the literal wording of the statute, then the nine-month rule concerning "notes" in section 78c(a)(10) would not apply here.

Second, the Court cannot accept the plaintiff's "negative implication." From the proposition that all notes nine months or less are not securities, it does not follow as a matter of logic that all notes longer than nine months are securities:[26] some notes longer than nine months may not be "securities."[27] Occasionally, however, courts may draw "negative implications" from certain propositions of law in the course of construing the statutes or provisions.

The negative implication is not the result of flawed logical reasoning, but rather is a conclusion elicited from the proposition of law prior to, in conjunction with, in the course of, or as an aid in the determination of legislative intent or some other method of statutory construction.[28] Given the nature of a negative implication as an accessory to the divination of Congressional intent, the Court, before accepting the "negative implication" that the plaintiff propounds, must determine whether such an implication would comport with the Congressional policy behind the securities

---

**25.** The "negative implication" can aid a court in the construction of a statute. One commentator described the operation of the negative implication on statutes with exclusions as follows: "The enumeration of exclusions," like that of short term notes from the '34 Act, "from the operation of a statute indicates that the statute should apply to all cases not specifically excluded. Exceptions strengthen the force of the general law and enumeration weakens it as to things not expressed." 2A N. Singer, *Statutes and Statutory Construction* § 47.23, at 194 (C.D. Sands 4th ed. 1984) [hereinafter "2A *Sutherland Statutory Construction*"].

The maxim *"expressio unius est exclusio alterius* ... is a rather elaborate, mysterious sounding, and anachronistic way of describing the negative implication." *See* R. Dickerson, *The Interpretation and Application of Statutes* 234 (1975).

**26.** *See* R. Dickerson, *supra* note 25, at 234.

**27.** Despite the logical fallacy in reasoning, some courts have accepted the argument that if all notes less than nine months are not securities then all notes more than nine months are, unless the context otherwise requires. *See Ex-*

change *Nat'l Bank v. Touche Ross & Co.*, 544 F.2d 1126, 1132, 1137–38 (2d Cir.1976); *see also Chemical Bank v. Arthur Andersen & Co.*, 726 F.2d 930, 939 (2d Cir.), *cert. denied*, 469 U.S. 884, 105 S.Ct. 253, 83 L.Ed.2d 190 (1984); *cf. American Bank & Trust Co. v. Wallace*, 702 F.2d 93, 94 (6th Cir.1983) (dicta) (noting that "[i]f construed literally, the 1934 Act would cover no note ... with a maturity not exceeding nine months, and would cover all notes with a maturity in excess of nine months," but the court nonetheless stated that it would not construe the statute literally).

**28.** *Expressio unius est exclusio alterius* "helps neither to find meaning nor to decide cases," but instead helps only to "classify and label results reached by other means." R. Dickerson, *supra* note 25, at 228 & n. 33.

In *NLRB v. Lion Oil Co.*, 352 U.S. 282, 290–91, 77 S.Ct. 330, 334–35, 1 L.Ed.2d 331 (1957), for instance, the Court drew a negative implication from a statute, but only in the course of an effort to discover Congressional intent and the purposes of the statute. *Id.* at 288–92, 77 S.Ct. at 333–36.

**580**

laws.[29]

The Court finds that the legislative intent behind and the purposes of the securities laws do not support the plaintiff's negative implication. Although it is true that the securities laws have a remedial purpose and the Court must read them to effectuate that purpose, it is also true that Congress did not intend the securities laws to be a cure for all frauds. *Marine Bank v. Weaver*, 455 U.S. 551, 556, 102 S.Ct. 1220, 1223, 71 L.Ed.2d 409 (1982). More specifically, Congress did not intend the securities laws to provide a remedy in disputes arising from ordinary commercial transactions. *Union Planters Nat'l Bank v. Commercial Credit Business Loans, Inc.*, 651 F.2d 1174, 1185 (6th Cir.), *cert. denied*, 454 U.S. 1124, 102 S.Ct. 972, 71 L.Ed.2d 111 (1981).

■ The negative implication from the statute, which the plaintiff proposes, threatens to stretch the scope of the securities laws to cover all loan transactions in which the notes are longer than nine months in duration. Given that this consequence of the plaintiff's argument runs counter to the purpose of and the intent behind the securities laws, the court cannot accept it. Accordingly, the Court holds that notes longer than nine months are not securities per se, nor does their duration per se count in favor of inclusion within the securities laws for purposes of the risk capital test. This holding comports with other decisions involving notes. *See Great Western Bank & Trust v. Kotz*, 532 F.2d 1252, 1258 (9th Cir.1976) (per curiam) (10–month note not a security); *Home Guar. Ins. Corp. v. Third Fin. Servs., Inc.*, 667 F.Supp. 577, 582 (M.D.Tenn.1987) (30–year notes not securities).

A participation in a note with a duration longer than nine months need not be a security either. In *Union Planters*, for example, the Sixth Circuit held that a participation in a line of credit, advanced pursuant to a "Secured Term Loan Agreement" lasting more than five years, was not a security. *Union Planters*, 651 F.2d at 1182 (revolving term loan due on November 30, 1978); *see id.* at 1179 (loan agreement apparently signed on July 11, 1973).

Having rejected the plaintiff's reasoning by way of "negative implication," the Court notes that the proper way to analyze notes should be to exclude from the definition of "security" notes less than nine months in duration, according to the terms of the statute, unless the context or the purpose of the securities laws provided otherwise. As for notes longer than nine months, however, the exclusionary clause applying to short-term notes simply doesn't apply. The courts should not automatically presume that long-term notes are within the definition of "security," thereby placing a burden on defendants to show that the context required the courts not to apply the statute. Instead, the courts should analyze long-term loans in the same way that they would any other obligation which allegedly is a security.

For participations in loans, however, the analysis need not even consider the nine-month exclusionary provision. Since the exclusionary clause for short-term loans by the terms of the statute applies only to "notes," the Court need not consider it in the analysis of the loan participation and sales documents. Instead, it will analyze them as it would any other obligation or instrument.

In comparing the three alleged securities to other instruments in terms of the time factor, the Court notes that the term of the underlying loan to Sowles was eighteen months. As between two polar opposites, a short term of a very few months and a long term consisting of decades, the Court holds that the underlying loan was of a

---

**29.** "[F]actually, there should be some evidence the legislature intended its (expressio unius) application lest it prevail as a rule of construction despite the reason for and the spirit of the enactment." 2A *Sutherland Statutory Construction, supra* note 25, § 47.25, at 209.

Even if the Court must acknowledge the plaintiff's negative implication as having the status of a literal interpretation of section 3(a)(10), the Court is not bound by it. If a literal reading of a statute would be inconsistent with Congressional intent, or would lead to absurd results, the Court can read the statute so as to comport with the real intent of Congress. *See id.* § 46.07, at 110.

relatively short term. *Accord American Fletcher Mortgage Co. v. U.S. Steel Credit Corp.*, 635 F.2d 1247, 1254 (7th Cir.1980) (court considered three years to be a "short note maturity"), *cert. denied*, 451 U.S. 911, 101 S.Ct. 1982, 68 L.Ed.2d 300 (1981).

Given that the Sowles loan was relatively short term, the Court also holds that the participating ownership interest in the Sowles loan and the Participation Certificate reflecting DMC's interest were also of short duration. Once Sowles made the final loan payment and TransOhio gave DMC its share of the proceeds, the participating ownership interest in the Sowles loan would cease to exist and the Participation Certificate would no longer be valid. The Sale and Trust Agreement provided that TransOhio would disburse monthly the pro rata portions of loan payments to which DMC was entitled. Sale and Trust Agreement at 5, *reprinted in* Complaint app. A at 5. At most, then, the participating ownership interest and the Participation Certificate would have lasted only until a month (less a day) after Sowles submitted the final payment of the eighteen-month loan.

The Sale and Trust Agreement was also of short duration. The agreement provided that the parties could negotiate for the participation in new loans and for future advances to old borrowers. Theoretically, the Agreement could last forever if the parties replaced retired loans with new loans under the agreement. Here, however, the only loan that the agreement covered ab initio was the Sowles loan. Thus, at the time the parties signed the Sale and Trust Agreement, the terms of the DMC–TransOhio Agreement contemplated that it would last only as long as the participating ownership interest and the Participation Certificate: eighteen months plus the time it would take for TransOhio to disburse DMC's pro rata portion of the final loan payment. Again, this time period is relatively short and the parties did not extend the contract beyond this time by agreeing to bring new loans within the agreement.

In sum, the Sale and Trust Agreement, the participating ownership interest, and the Participation Certificate were of rela-tively short duration. The time factor, then, counts against the position that these documents were "securities" within the meaning of the securities laws.

### b. *Collateral*

"The existence of collateral is strongly suggestive of a commercial loan." *Union Planters Nat'l Bank v. Commercial Credit Business Loans, Inc.*, 651 F.2d 1174, 1182 (6th Cir.), *cert. denied*, 454 U.S. 1124, 102 S.Ct. 972, 71 L.Ed.2d 111 (1981). By contrast, unsecured transfers indicate the presence of an investment. "The unsecured lender is generally more dependent upon the managerial skills of the borrower than is a secured party who can look to the collateral in case of inability to repay." *Great Western Bank & Trust v. Kotz*, 532 F.2d 1252, 1258 (9th Cir.1976) (per curiam).

On one hand, the defendant contends that the Sowles loan was secured by a mortgage. Its argument, then, seems to be that DMC was a secured party which could turn to the Houston real estate in case Sowles defaulted. On the other hand, the plaintiff contends that DMC had no collateral. Focusing on the Sale and Trust Agreement, not the underlying loan, the plaintiff claims that "[a]ll [it] had was the naked promise of TransOhio that it would fulfill its duty as 'lead lender/trustee.'" Plaintiff's Memorandum–Contra Defendant's Motion to Dismiss at 7.

These arguments demonstrate the complexity added to the analysis by the participatory nature of the agreement between DMC and TransOhio. Were the agreement a simple loan, the Court could ascertain whether the lender's advances were secured by collateral in the hands of the borrower. In order to assure that the borrower would submit its scheduled loan payments, the lender would take a security interest in the collateral.

Here, however, DMC is "purchasing" a share of the loan TransOhio made to Sowles. DMC paid TransOhio funds representing a percentage of the money which TransOhio lent to Sowles. As loan repayments, Sowles paid TransOhio all of the money due on the loan and TransOhio paid DMC its pro rata share as DMC's trustee.

The real estate secured Sowles' loan repayments to TransOhio, but DMC had no security interest in TransOhio property to secure TransOhio's payments to DMC of its share of the loan proceeds.

The issue then is whether, for the purposes of the *Great Western* "risk capital" test, assets in the hands of the underlying loan borrower can act as collateral for payments that the loan participant receives from the trustee, and thus count against inclusion of a loan participation within the definition of "security." [30] The determination of this issue will vary from case to case. Consider the two polar opposite possibilities concerning collateral backing payments to a loan participant.

At one extreme, a loan company/trustee could sell "shares" in the profits to be received from loans made to certain borrowers without giving the participant any remedies in case the borrower defaults on the loan. Although collateral would secure the borrower's payments to the trustee, the loan participant has no security interest in it. The participant, then, would have to rely on the managerial expertise of the loan company/trustee to make sound loans to reliable borrowers and on the skill of the borrower to use the proceeds wisely. In such a case, the collateralization factor would militate in favor of inclusion within the definition of a "security."

At the other extreme, a loan company/"trustee" could borrow funds from a "participant" to lend to the ultimate borrower, and to do so, the trustee could give the "participant" a security interest in some of its own property. In such a case, not only would the loan to the third party have security in the form of, say, real estate, but the loan from the "participant" to the "trustee" would also have the backing of security. This double collateralization would without a doubt count against including this arrangement within the definition of a "security."

The facts concerning collateralization in the case at bar fall between these two extremes. In general, the Sales and Trust Agreement gives the participant a remedy in case of the borrower's default, since the trustee must foreclose and share in the proceeds of any sale, although discretion as to the timing of such foreclosure lies with the trustee. Since DMC was the owner of the largest portion of the Sowles loan, however, DMC had the right to direct TransOhio to foreclose on the real estate and recover its funds in the event that Sowles failed to make the scheduled loan payments. Sale and Trust Agreement, at 8–9, 10, *reprinted in* Complaint app. A. at 8–9, 10.

If, however, Sowles paid TransOhio, but TransOhio failed to submit to DMC its pro rata share of Sowles' monthly payments, then DMC would not have collateral in the possession of TransOhio upon which it could foreclose. Certainly, no contractual provision in the Loan Participation Sales and Trust Agreement would permit DMC to foreclose upon Sowles to pay TransOhio's obligations if Sowles had not defaulted.

The lack of a DMC security interest in TransOhio property, however, does not weigh in favor of considering the Participation Certificate and the Sale and Trust Agreement to be "securities," all things considered. TransOhio acted here as a mere conduit for loan payments from Sowles to DMC. The Sale and Trust Agreement in effect made DMC another lender for Sowles. TransOhio was but a trustee, receiving DMC's share of payment's on its behalf. Although TransOhio's obligation to forward to DMC its share of the payments was not secured by collateral, the normal trustee-beneficiary relationship requiring disbursement of collected funds due to the beneficiary would not involve a security interest in the trust-

---

**30.** The courts analyzing loan participations have simply assumed that collateral in the hands of the ultimate borrower is sufficient for purposes of the "risk capital" test's consideration of collateral and counts against inclusion of the participation within the definition of "security." *Un-*

*ion Planters,* 651 F.2d at 1182; *cf. Home Guar. Ins. Corp. v. Third Fin. Servs., Inc.,* 667 F.Supp. 577, 582 (E.D.Tenn.1987) (collateral in hands of borrower sufficient when lender/trustee sold 100% of loan to another finance company).

ee's property either. Nor would breach of that duty normally constitute securities fraud because of a lack of collateral securing the trustee's payments to the beneficiary. If TransOhio failed to convey to DMC its share of loan payments from Sowles, the beneficiary could sue for breach of fiduciary duty. Such a breach, though, is not necessarily indicative of securities fraud.

From a review of the circumstances, then, it appears that real estate in the hands of Sowles acts as collateral for the benefit of DMC for purposes of the "risk capital" test. *See Union Planters,* 651 F.2d at 1182 (borrower's accounts receivables acted as collateral for purpose of "risk capital" test analysis of a participation in loan to borrower); *cf. Home Guaranty Ins. Corp. v. Third Fin. Servs., Inc.,* 667 F.Supp. 577, 582 (M.D.Tenn.1987) (collateral in hands of borrower militated against inclusion of sale of entire loan within definition of "securities"). The Sale and Trust Agreement and the Participation Certificate which incorporates the Agreement by reference together grant DMC the right to direct a foreclosure on collateral in the possession of Sowles in case of Sowles' default.

Accordingly, DMC was not dependent to any significant degree upon TransOhio's managerial skills in making wise loans or in Sowles' skill as a developer. In sum, then, the factor of collateralization militates against inclusion within the statutory definition of a "security" any of the three candidates: the participating ownership interest, the Sale and Trust Agreement, and the Participation Certificate.

#### c. *Form of the Obligation*

The form of the obligation "may help to explain the circumstances of issuance of the obligation." *Great Western Bank & Trust v. Kotz,* 532 F.2d 1252, 1258 (9th Cir.1976) (per curiam). If the agreement between the parties referred to "shares" and the arrangement suggested an investment, then the form factor would militate in favor of inclusion within the statutory

definition of a "security." If, however, the agreement between the obligor and the obligee was in the form of a "loan" or other normally commercial arrangement, the factor would not indicate a "security."

The defendant claims that the Sale and Trust Agreement refers to the transaction between DMC and TransOhio as a "loan," which would not manifest the existence of a security. On the other hand, the plaintiff notes that the transferable "Participation Certificates" appear to be securities.

From the Court's examination of the Sale and Trust Agreement,[31] it finds that the transaction between DMC and TransOhio was more than a mere "loan" in form. The Agreement provides for the sale of "participating ownership interests" in the enumerated loans. Pursuant to the agreement, DMC purchased a portion of the Sowles loan.

According to the Sales and Trust Agreement, DMC's purchase of an interest in the Sowles loan is not the same as lending money to TransOhio. If Sowles defaults, for example, DMC must look to Sowles and his real estate for a remedy, not TransOhio; TransOhio had no obligation to pay DMC in case Sowles defaulted until the defendant collected from Sowles. Sale and Trust Agreement at 6, *reprinted in* Complaint app. A at 6. By contrast, if DMC had merely loaned money to TransOhio, then TransOhio would have to pay DMC scheduled payments even if Sowles had defaulted.

Although the defendant is not correct in characterizing the form of the transaction between DMC and TransOhio as a "loan," the plaintiff is also incorrect when it asserts that the Participation Certificate in this case is in the normal form of a freely transferable security, such as a stock certificate. *See* Participation Certificate No. 1, *reprinted in* Plaintiff's Supplemental Exhibit at 2. Two facts demonstrate the inaccuracy of the plaintiff's characterization of the Participation Certificate.

31. The plaintiff incorporated the Sale and Trust Agreement by reference into the Complaint.

Thus, the Court may consider it as part of the pleadings.

First, the transfer of the participating ownership interest of a loan, which the Participation Certificate represented, involved restrictions on the use of the funds that DMC transferred to TransOhio. These restrictions are relevant and weigh against inclusion of the Sale and Trust Agreement, the Participation Certificate, or the participating ownership interest within the category of "securities." *Ohio v. Crofters*, 525 F.Supp. 1133, 1137 (S.D.Ohio 1981). "The greater the restrictions placed on the use of the funds and on the conduct of the borrower's financial operations by the form of the obligation, the more likely the transaction was a commercial loan." *Id.*

Here, DMC used its funds to purchase a segment of the Sowles loan. Although TransOhio loaned Sowles money before selling DMC an interest in the loan, thereby allowing TransOhio to spend the cash received from DMC as it pleased, DMC's payment really represents a portion of the money TransOhio had lent to Sowles. That is, the Sale and Trust Agreement required TransOhio to allocate the money it received so as to reimburse itself for outlays it had made to Sowles, a single, limited use of the funds. Sowles, moreover, could use funds it received in only a limited fashion. The funds were for use only in the construction of the Project. The funds did not simply augment Sowles' general operating fund.

Second, although the participation interest itself is transferable, the Participation Certificate itself is not. It is not in the form of freely transferable obligations such as bonds, currency, or stock. The Participation Certificate is actually an addendum to the Sale and Trust Agreement. It specifies the names of the buyer and seller, serves as a receipt of the amount paid by DMC to TransOhio, and sets the interest rate DMC was to receive. The Participation Certificate, then, could only be a "security" if it were part of an "investment contract" composed of the Certificate and the Sale and Trust Agreement together.

Although the form of the Participation Certificate is not suggestive of a security, the Court must also consider the form of the Sale and Trust Agreement. It is not clear from the face of the Sale and Trust Agreement whether or not it is in the form of an investment contract. Although the reality of the transaction seems to be that of a sale of a segment of a commercial loan, the parties couched the agreement in terms of participating ownership interests. Depending upon the circumstances, the contract as a simple purchase and sale agreement could encompass an investment or a simple purchase of part of a commercial loan.

Nonetheless, other parts of the Sale and Trust Agreement do not fit the "investment contract" form. Specifically, the contract contains elaborate provisions for procedures to follow in case of default. Such provisions are not typically contained in a security. *American Bank & Trust Co. v. Wallace*, 529 F.Supp. 258, 262 (E.D.Ky. 1981), *aff'd*, 702 F.2d 93 (6th Cir.1983). The form, then, of the Sale and Trust Agreement weighs slightly against including it within the definition of a "security."

If any obligation, though, were in the form of a security, it would be the participating ownership interests themselves. Since they are transferable and could be distributed among as many as ten owners,[32] they could resemble securities in form. The "risk capital" test factor of form, then, weighs slightly in favor of inclusion within the definition of a "security," the participating ownership interests, but not the Sale and Trust Agreement or the Participation Certificate.

### d. *The Circumstances of Issuance*

This factor requires the court to determine whether the issuer, distributor, or alleged underwriter of the obligations distributed them to a single party or to a large class of investors. Such a determination would "shed[ ] light on the nature of the financing." *Great Western Bank &*

---

**32.** The Sale and Trust Agreement provided that TransOhio and DMC could transfer participating ownership interests only if they were in blocks of at least ten percent of the entire loan. Sale and Trust Agreement at 4, *reprinted in* Complaint app. A at 4.

*Trust v. Kotz,* 532 F.2d 1252, 1258 (9th Cir.1976) (per curiam).

The complaint alleges only that TransOhio sold one participating ownership interest in the Sowles loan and DMC was the purchaser. Although the Sale and Trust Agreement gave TransOhio the right to sell other participating ownership interests to third parties, the record is void of any such allegation. The Court, then, concludes, then, that the pleadings indicate only a limited offering, an indication that the Sale and Trust Agreement, the Participation Certificate, and the participating ownership interest were not "securities."

Another circumstance of issuance relevant to the analysis is whether the impetus for the transaction came from the person who has the money or from the person who needs the money. *See American Bank & Trust Co. v. Wallace,* 702 F.2d 93, 96–97 (6th Cir.1983). In applying the "risk capital" test, the *American Bank & Trust* court noted that the borrowers in that case provided the impetus for the transaction rather than the lender. *Id.* Where the impetus comes from the person who needs the money, this circumstance of issuance would suggest that the transaction did not involve a security.

In the case at bar, DMC alleges that TransOhio provided the impetus for the Sale and Trust Agreement. The defendant, according to the plaintiff, "was in severe financial trouble." Complaint at 2. In order to raise cash, the defendant sold participation interests in its loans, including the one it sold to DMC. *See id.* at 2–3. Since the plaintiff itself notes that the party needing the money, the defendant, was the party seeking to enter the transaction, this circumstance of issuance also suggests that the transaction did not involve "securities."

Therefore, the factor of the circumstances of the issue militates against inclusion within the definition of a "security," the Sale and Trust Agreement, the Participation Certificate pertaining thereto, and the participating ownership interest transferred therein.

### e. *Relationship Between the Amount Borrowed and the Size of the Borrower's Business*

The relationship between the amount "borrowed" and the size of the "borrower's" business is important because "the larger the relative amount, the greater the stake, and therefore the risk, of the lender." *Great Western Bank & Trust v. Kotz,* 532 F.2d 1252, 1258 (9th Cir.1976) (per curiam). The greater the risk, the more likely it is that the obligation was a "security," as opposed to a "loan."

The plaintiff claims that the underlying loan constituted nearly all of Sowles' total capital committed to the Project. This fact, however, is not directly relevant to the real issue: whether the loan amount was large in relation to Sowles' entire business. Nonetheless, the Court cannot foreclose the possibility that plaintiff can prove the proposition that the loan amount was indeed relatively large. At this early juncture, and in the absence of any evidence in the record pertaining to this factor, the Court will resolve this matter in favor of the plaintiff. *See American Bank & Trust Co. v. Wallace,* 529 F.Supp. 258, 262 (E.D.Ky.1981), *aff'd,* 702 F.2d 93 (6th Cir. 1983). Therefore, the Court must consider the relationship between the amount "borrowed" and the size of the "borrower's" business to indicate that the Sale and Trust Agreement, the Participation Certificate, and the participating ownership interest do belong within the definition of a "security."

### f. *The Intended Use of the Funds*

"Proceeds constituting an essential ingredient of enterprise formation ... are generally securities. On the other hand, those used to maintain current financial position generally are not." *Great Western Bank & Trust v. Kotz,* 532 F.2d 1252, 1258 (9th Cir.1976) (per curiam). According to the *Great Western* court, "funds spent on current operations" are not indicative of the existence of a security because they generally "generate faster return than do funds used for capital expenditure." *Id.*

In this case, the defendant claims that the Sowles used the funds only for the

Project and not for capital formation. The plaintiff, however, contends that the use of the funds for the Project does not constitute the funding of current operations of an established business.

The pleadings are devoid of information concerning the history of Sowles' business. The Court is not sure whether the Project was Sowles' first or only project, or whether it was but one of many such developments. If the Project was the sum total of Sowles' business, the funds would constitute money to form Sowles' enterprise as well, thus suggesting that the participation was a "security." If the Project was but a small part of Sowles' business, then the transaction would appear more to be the funding of current operations of an established business.

Nonetheless, the parties do not dispute the fact that the funds were to be used as seed money for the Project. Having only this fact at its disposal, and in the context of a Rule 12(b)(6) motion to dismiss, the Court must conclude that the use of the funds were more indicative of an investment than a loan. The funds appear more like "risk capital to obtain new productive assets" than the capital for the financing of current operations. Thus, the Court must weigh this factor in favor of inclusion within the definition of "securities" the participating ownership interest, the Participation Certificate, and the Sale and Trust Agreement.

Having explored the application of the *Great Western* "risk capital" test, the Court must now ascertain whether these six factors combined suggest that the Sale and Trust Agreement, the Participation Certificate, and the participation ownership interest involved an investment or not. No one factor is dispositive in this determination, but rather the Court must consider the totality of the circumstances. *See Great Western,* 532 F.2d at 1258.

■ In considering all of the circumstance surrounding this transaction, the Court determines that the Sale and Trust Agreement was not an agreement involving an "investment" within the meaning of the securities laws. No investment took place because the contract was of short duration, was supported by collateral, was not in a form suggestive of a "security," and was not issued under circumstances which would suggest that the agreement involved a "security." The large size of the financing and the intended use of the funds cannot outweigh the other factors. For the same reasons, the Participation Certificate as well did not entail an "investment."

■ The participating ownership interest itself is a closer case. It more resembles a "security" in form than the Sale and Trust Agreement or the Participation Certificate. Nonetheless, the Court concludes on the basis of the remaining three factors, including the most critical element, time,[33] that the participating ownership interest did not manifest the presence of an investment. The form, the relatively large size of the financing, and the use of the funds to build the entire Project are not enough in and of themselves to outweigh the other factors and indicate here that the participating ownership interest was an investment. *Cf. Home Guar. Ins. Corp. v. Third Fin. Servs., Inc.,* 667 F.Supp. 577, 582 (M.D. Tenn.1987) (despite large size of loan, financing entire condominium project, sale of loans to finance company was not a "security").[34]

---

**33.** "The most important factor is *time.*" *Great Western,* 532 F.2d at 1257.

**34.** *Home Guaranty* noted that the application of the first *Howey–Forman* test prong, the presence of an investment, was the same as the determination of the characteristics of the alleged securities, the second *Landreth* test prong. *Id.* at 582 n. 6. In this Circuit, the "risk capital" test determines whether an investment is present. *Union Planters Nat'l Bank v. Commercial Credit Business Loans, Inc.,* 651 F.2d 1174, 1182 (6th Cir.), *cert. denied,* 454 U.S. 1124, 102 S.Ct. 972, 71 L.Ed.2d 111 (1981). Therefore, utilization of the "risk capital" test is also the procedure for determining the characteristics of the instrument. *Cf. Home Guaranty,* 667 F.Supp. at 582 & n. 6 (where outcome of "risk capital" test showed "commercial" rather than "investment" nature of the transaction, the court had thereby decided whether the transaction involved a "security" under the "characteristics of the instrument" approach).

## 2. Common Venture

The second prong of the *Howey–Forman* test requires the Court to consider whether the transaction here created a "common venture." To decide this question, the Sixth Circuit has adopted the so-called "horizontal commonality" test. The "horizontal commonality" test directs the Court to consider whether the record shows "a sharing or pooling of funds." *Union Planters Nat'l Bank v. Commercial Credit Business Loans, Inc.*, 651 F.2d 1174, 1183 (6th Cir.), *cert. denied,* 454 U.S. 1124, 102 S.Ct. 972, 71 L.Ed.2d 111 (1981). That is, the Court must determine if the arrangement "ties the fortunes of each investor in a pool of investors to the success of the overall venture." [35] *Id.; see, e.g., Hart v. Pulte Homes Corp.,* 735 F.2d 1001, 1004 (6th Cir.1984); *Curran v. Merill Lynch, Pierce, Fenner and Smith,* 622 F.2d 216, 221–24 (6th Cir.1980), *aff'd on other grounds,* 456 U.S. 353, 102 S.Ct. 1825, 72 L.Ed.2d 182 (1982).

■ In the facts of the case at bar, the Court determines that DMC and TransOhio did enter into a common enterprise. Like *Union Planters,* the fortunes of the two lenders in this case "were inextricably intertwined." *Union Planters,* 651 F.2d at 1183. The ownership interests of DMC and TransOhio "were not unitary in nature; the success or failure of each was not without regard to the other. The profits or losses flowed uniformly to each." *Id.*[36]

Therefore, the Court believes that the Loan Participation Sale and Trust Agreement, supplemented by the Participation Certificate, provided for a common venture between DMC and TransOhio. The transfer of the participating ownership interest pursuant to the agreement initiated this common venture. The Sale and Trust Agreement, the Participation Certificate, and the participating ownership interest, then, all satisfy this second prong of the *Howey–Forman* test.

## 3. Reasonable Expectation of Profits

In the third prong of the *Howey–Forman* test, the plaintiff must show that it had a reasonable expectation that it would accrue profits. The defendant argues that the return received by DMC consisted in repayments of principal and payments of interest. The fixed nature of the interest payment, according to the defendant, necessarily places the Sale and Trust Agreement, the Participation Certificate, and the participating ownership interest outside the scope of the category of "securities." More specifically, the defendant could argue that DMC's fixed returns were not "profits," within the meaning of the *Howey–Forman* test.

■ The Court, however, rejects the notion that the fixed nature of the return of an instrument per se bars its inclusion within the category of "profits." The Sixth Circuit noted that "the Securities Acts encompass debt as well as equity instruments," which commonly offer fixed returns. *Union Planters Nat'l Bank v. Commercial Credit Business Loans, Inc.,*

This Court agrees with the *Home Guaranty* court's decision to equate the second prong of the *Landreth* test with the first prong of the *Howey–Forman* test and with the "risk capital" test. Given the significant body of case law discussing the *Howey–Forman* test and "risk capital" test, this holding makes the *Landreth* test easier to administer.

In the case at bar, even if the three alleged securities had titles traditionally associated with securities, *see supra* notes 17–18 and accompanying text (the first prong of the *Landreth* test), analysis of the "risk capital" test shows the absence of an investment, within the meaning of the *Howey–Forman* test. Therefore, the alleged securities herein would also fail to satisfy the second prong of the *Landreth* test.

**35.** In accepting the horizontal commonality test, the Sixth Circuit rejected the vertical commonality test. Vertical commonality exists where "the fortunes of the investor are interwoven with and dependent upon the efforts and success of those seeking the investment of third parties." *Id.* at 1183. The vertical commonality test requires a showing only of a common venture between investor and promoter without the requirement in the horizontal commonality test that the plaintiff show a pooling of funds by investors. *See id.*

**36.** *But see Home Guar. Ins. Corp. v. Third Fin. Servs., Inc.,* 667 F.Supp. 577, 583 (M.D.Tenn. 1987) (horizontal commonality did not exist when one commercial lender/loan administrator sold loans to a savings and loan association).

651 F.2d 1174, 1184 (6th Cir.) (dicta), *cert. denied*, 454 U.S. 1124, 102 S.Ct. 972, 71 L.Ed.2d 111 (1981). Although the Court considers the fixed nature of the return to be significant, it is not dispositive.[37] Other factors, such as contingencies of the return, are relevant.

The proper approach to this question is to determine whether the plaintiff had an expectation of capital appreciation. *Union Planters*, 651 F.2d at 1184-85; *see United Housing Found., Inc. v. Forman*, 421 U.S. 837, 852-53, 95 S.Ct. 2051, 2060-61, 44 L.Ed.2d 621 (1975);[38] *American Bank & Trust Co. v. Wallace*, 529 F.Supp. 258, 263 (E.D.Ky.1981), *aff'd*, 702 F.2d 93 (6th Cir. 1983); *Ohio v. Crofters*, 525 F.Supp. 1133, 1139 (S.D.Ohio 1981). The fixed nature of the return is one factor to consider in this analysis. Here, like *Union Planters*, DMC's return "was simply the repayment of the amounts advanced plus a fixed rate of interest." *Union Planters*, 651 F.2d at 1185. The Participation Certificate set the rate at 12.5%.

Unlike *Union Planters*, however, the interest payments were somewhat contingent. In *Union Planters*, the participation trustee held back 15% of the loan amounts to insure the payment of interest to the loan participant. The participant never disputed the adequacy of this fund and the participant received all of the interest to which it was entitled prior to the collapse of the borrower. Thus, payment of the interest was contingent only upon the passage of time. *See id.*

■ Here, however, TransOhio retained no such fund to insure the payment of

interest to DMC. Moreover, if Sowles defaulted on the loan, DMC would receive nothing from TransOhio until TransOhio was successful in collecting from Sowles. An interest fund, however, is not a necessary condition of a commercial transaction. Further, the Sale and Trust Agreement indicates that the plaintiff's return "was not of a different nature than in a commercial lending transaction." *Id.* The contingencies for return were only those associated with the normal commercial loans. Accordingly, the Court holds that DMC "had no reasonable expectation of profit as that term is used in the *Howey–Forman* securities context" with regard to the Sale and Trust Agreement, the Participation Certificate, and the participating ownership interest. *Id.*

#### 4. A Return Derived from the Efforts of Others

The last element of the *Howey–Forman* test requires the Court to determine whether the alleged investor's return was "to be derived from the entrepreneurial or managerial efforts of others." *United Housing Found., Inc. v. Forman*, 421 U.S. 837, 852, 95 S.Ct. 2051, 2060, 44 L.Ed.2d 621 (1975). According to the complaint, Sowles provided some managerial and entrepreneurial efforts by bearing the responsibility for the development of the Project. Complaint at 3. TransOhio, the party seeking the alleged investment, however, bore only the responsibility to render administrative services of the kind that a lend leader in a loan participation agreement would normally

---

**37.** *But see American Bank & Trust Co. v. Wallace*, 529 F.Supp. 258, 263 (E.D.Ky.1981), *aff'd*, 702 F.2d 93 (6th Cir.1983). The Kentucky district court, in considering the issue, suggested that a fixed rate of return was dispositive, based on its reading of *Union Planters*. This Court rejects the Kentucky district court's interpretation of *Union Planters* and instead relies on Judge Rubin's reading of the Sixth Circuit case. On the strength of *Union Planters*, Judge Rubin held that a note from the defendant to the plaintiff met the *Howey–Forman* requirement of a reasonable expectation of profits, despite the fixed nature of the return to the plaintiff lender. *Ohio v. Crofters*, 525 F.Supp. 1133, 1139 (S.D. Ohio 1981).

**38.** In *Forman*, the Supreme Court stated:

> By profits, the Court has meant either capital appreciation resulting from the development of the initial investment ... or a participation in earnings resulting from the use of investors' funds.... In such cases the investor is "attracted solely by the prospects of a return" on his investment. By contrast, when a purchaser is motivated by a desire to use or consume the item purchased ... the securities laws do not apply.

*Id.* (citation omitted).

perform. *See generally* Sales and Trust Agreement.

The *Howey–Forman* requirement that "others" perform "entrepreneurial or managerial efforts" seems quite broad in application. The word "others" suggests that the plaintiff can satisfy the requirement as long as it can show that someone other than DMC performed such efforts. The plaintiff does not need to prove that the person taking the money is himself performing the entrepreneurial or managerial services. After all, when the public invests in an enterprise or a specific project, the company seeking these investments could subcontract for the performance of the tasks necessary to run the enterprise or complete the project. Similarly, if a person buys the stock of a shell company which loans money to entrepreneurs, the money paid to the shell is no less an investment simply because the shell itself performs no entrepreneurial efforts.

Also, language in *Howey* indicates that performance by "others" is not limited to the person taking the alleged investor's money. In its formulation of the *Howey–Forman* test, the final prong to be met is the requirement of a showing that the investor expects its return "from the efforts of the promoter *or a third party.*" *SEC v. W.J. Howey Co.*, 328 U.S. 293, 299, 66 S.Ct. 1100, 1103, 90 L.Ed. 1244 (1946) (emphasis added). The Supreme Court, then, clearly allows the final prong of the test to be met if anyone except the plaintiff performs "entrepreneurial or managerial" tasks pursuant to the investment.

In *Howey,* for instance, the W.J. Howey Company sold to the public small tracts of land in a citrus grove. When the sale took place, W.J. Howey salesmen encouraged the purchasers to contract with Howey-in-the-Hills Service, Inc., an affiliated but separate company, for the harvesting and mar-

keting of the fruit grown on the purchasers' land. *Id.* at 294–95, 66 S.Ct. at 1100–01. The sale of land and service contracts, in effect, enabled the purchasers to share in the profits of a large citrus fruit enterprise. *Id.* at 299–300, 66 S.Ct. at 1103–04. Thus, the Court held that these transactions involved the sale of "securities," despite the fact that the company taking the investors' money, W.J. Howey Company, was not the same as the corporation managing the fruit enterprise, Howey-in-the Hills.[39]

■ In the case at bar, TransOhio was a promoter and Sowles was a third party in relation to DMC. TransOhio's administrative duties performed in servicing the Sowles loan cannot satisfy the *Howey–Forman* requirement of "entrepreneurial or managerial efforts of others." The Sixth Circuit held that activities of a lend leader in a loan participation arrangement are not "entrepreneurial or managerial." *See Union Planters Nat'l Bank v. Commercial Credit Business Loans, Inc.*, 651 F.2d 1174, 1185 (6th Cir.), *cert. denied,* 454 U.S. 1124, 102 S.Ct. 972, 71 L.Ed.2d 111 (1981). Thus, TransOhio's activities cannot satisfy this prong of the test. Nonetheless, someone other than DMC did provide "entrepreneurial or managerial efforts" in this arrangement, specifically Sowles. Sowles performed such tasks by initiating the Project and constructing the buildings on the Houston real estate. Thus, DMC did expect a return from the "entrepreneurial or managerial efforts of others." Accordingly the Court holds that the Sales and Trust Agreement, the Participation Certificate, and the participating ownership interest all meet the final prong of the *Howey–Forman* test.

### E. Conclusion

■ The Court holds that the Loan Participation Sale and Trust Agreement, the

---

**39.** Although the two corporations were under common control and management, *id.* at 295, 66 S.Ct. at 1101, it is still true that the promotion process was separate from the performance of "entrepreneurial or managerial" tasks. That is, if W.J. Howey Company sold land to a purchaser, the purchaser could hire another company to harvest the fruit; in that case, a company other than the two Howey companies would perform the "entrepreneurial or managerial" efforts. The Howey land purchase would be no less a security merely because a third party company might pick the fruit. Accordingly, as long as someone other than the plaintiff performs "entrepreneurial or managerial" efforts, be it the promoter or a third party, the fourth *Howey–Forman* prong would be satisfied.

590

Participation Certificate pertaining thereto, and the participating ownership interest in the Sowles loan are not "securities" within the meaning of the securities laws. Given the variable nature of the names and characteristics of these items, they do not fulfill the *Landreth* conditions for a "security." Moreover, they do not satisfy the *Howey–Forman* test. Although the plaintiff successfully alleged a common venture where it derived income from the entrepreneurial or managerial efforts of others, there was neither an investment nor reasonable expectations of profits with regard to the alleged "securities." Therefore, the defendant's motion to dismiss is meritorious with respect to the allegations of securities fraud, Counts Two and Three of the Complaint.[40]

## II. PATTERN OF RACKETEERING ACTIVITY UNDER RICO

In addition to the argument that the Court should dismiss the plaintiff's claims based upon the securities laws, the defendant also contends that the plaintiff failed to state a claim under the Racketeer Influenced and Corrupt Organizations Act ("RICO")[41] upon which relief can be granted. Specifically, it argues that the plaintiff failed to set forth in its complaint claims sufficient to plead a "pattern of racketeering activity" within the meaning of RICO.

In its complaint, the plaintiff does allege that the defendant used or invested income derived from a "pattern of racketeering activity" in the operation of enterprises engaged in or affecting interstate com-

merce. *See* 18 U.S.C. § 1962(a) (1982). Moreover, the plaintiff claims that the defendant entered a conspiracy to violate section 1962(a), itself a violation of RICO. *See id.* § 1962(d). Persons injured by another's violation of section 1962 may file suit therefor in a district court for treble damages. *See id.* § 1964(c).

Despite the recitation of these claims, though, the defendant contends that the plaintiffs claims are insufficient to conform to the statutory definition of a "pattern of racketeering activity." 18 U.S.C. § 1961(5) (1982). Section 1961(5) defines "pattern of racketeering activity" to require a showing of "at least two acts of racketeering activity, one of which occurred after the effective date of this chapter and the last of which occurred within ten years (excluding any period of imprisonment) after the commission of a prior act of racketeering activity."[42] *Id.* § 1961(5).

To clarify this somewhat vague definition, the defendant advances the proposition that a "pattern of racketeering activity" requires a showing that the defendant engaged in multiple criminal schemes or multiple criminal episodes. Although the courts are split as to what constitutes a pattern of racketeering activity, the Court endorses this flexible method of identifying patterns.

To be precise, then, RICO requires a showing that the defendant engaged in either (1) more than one scheme; or (2) an open-ended, continuous scheme which contains a multiplicity of criminal episodes.[43] *MHC, Inc. v. UMW*, 685 F.Supp. 1370,

---

**40.** The Court's holding today is in accord with decisions in other Circuits holding that participation interests in loans were not securities. *Kansas State Bank v. Citizens Bank*, 737 F.2d 1490, 1493–95 (8th Cir.1984); *American Fletcher Mortgage Co. v. U.S. Steel Credit Corp.*, 635 F.2d 1247, 1253–55 (7th Cir.1980), *cert. denied*, 451 U.S. 911, 101 S.Ct. 1982, 68 L.Ed.2d 300 (1981); *United Am. Bank v. Gunter*, 620 F.2d 1108, 1113–19 (5th Cir.1980); *see generally* L. Loss, *supra* note 11, at 170.

**41.** RICO is actually Title IX of the Organized Crime Control Act of 1970, Pub.L. No. 91–452, §§ 901–904, 84 Stat. 922, 941–48.

**42.** The timing of any alleged acts of racketeering is not at issue.

**43.** The showing of two acts of racketeering is a necessary, but not a sufficient condition of proving a "pattern of racketeering activity." *Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 496 n. 14, 105 S.Ct. 3275, 3285 n. 14, 87 L.Ed.2d 346 (1985); *see, e.g., Superior Oil Co. v. Fulmer*, 785 F.2d 252, 256 (8th Cir.1986). Indeed, the target of RICO is not sporadic activity, but rather acts (1) which have some *relationship* with each other, "similar purposes, results, participants, victims, or methods of commission," for instance; and (2) which entail *continuity*, some threat of continuing, ongoing illegal activity. *Sedima*, 473 U.S. at 496 n. 14, 105 S.Ct. at 3285 n. 14 (quoting 18 U.S.C. § 3575(e) (1982) (repealed 1984)).

1384–85 (E.D.Ky.1988); *see Cincinnati Gas & Elec. Co. v. General Elec. Co.*, 656 F.Supp. 49, 79 (S.D.Ohio 1986); *Temporaries, Inc. v. Maryland Nat'l Bank*, 638 F.Supp. 118, 123 (D.Md.1986); *Papai v. Cremosnik*, 635 F.Supp. 1402, 1412–13 (N.D.Ill.1986); *Soper v. Simmons Int'l, Ltd.*, 632 F.Supp. 244, 253–54 (S.D.N.Y. 1986); *see generally Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 496 n. 14, 105 S.Ct. 3275, 3285 n. 14, 87 L.Ed.2d 346 (1985).

In any case, the crux of the defendant's argument is that the plaintiff has failed to allege "at least two acts of racketeering activity." TransOhio reasoned that the plaintiff can neither show multiple schemes or multiple criminal episodes. It is apparent from TransOhio's motion to dismiss that it reads the Complaint to recite allegations only of the alleged fraud against DMC. With only one criminal episode in the Complaint, TransOhio posits that the Complaint fails to allege a pattern of racketeering activity.

The plaintiff replies that the Complaint does allege two acts of racketeering, namely the defendant's actions in defrauding DMC and TransOhio's alleged fraud on Hollywood Federal Savings and Loan Association ("Hollywood Federal"). The Court notes that the Complaint indeed contains allegations of a fraud similar to the one alleged here. According to the Complaint, TransOhio signed a sale and trust agreement with Hollywood Federal identical to the one signed by DMC. As a result of alleged failures to ensure that Hollywood Federal, the loan participant, would receive payment, failures similar to the kind of omissions alleged in this case, Hollywood Federal filed suit in the Southern District of Florida.[44]

In its reply memorandum, the defendant argues that the events involving Hollywood Federal cannot suffice to allege a second act or episode of racketeering activity. First, the defendant contends that the plaintiff did not have sufficient justification to repeat in its complaint the allegations contained in the complaint filed by Hollywood Federal. That is, the defendant claims that the plaintiff relied on the Hollywood Federal complaint's written account of the alleged fraud, despite the plaintiff's lack of first-hand knowledge and the plaintiff's failure to conduct its own investigation into these allegations. Thus, the defendant argues that the plaintiff has no independent basis for believing the factual claims in Hollywood Federal's complaint, and the Court must disregard these claims in determining whether DMC alleged a pattern of racketeering activity.

Second, the defendant notes that the Southern District of Florida dismissed the Hollywood Federal complaint.[45] This dismissal, it argues, prevents the Court from accepting it as part of a pattern of racketeering activity for purposes of this motion. In sum, then, the "plaintiff's misguided reliance on pure hearsay in … the *Hollywood Federal* complaint, combined with the dismissal of that complaint, must be fatal to plaintiff's RICO cause of action." Reply Memorandum of Defendant at 13. The Court will address the defendant's two rebuttal arguments in turn.

### A. *Dismissal for Failure to Investigate*

■ Although the Complaint contains two sets of allegations, the defendant would have the Court ignore the factual claims regarding the Hollywood Federal transaction because the plaintiff failed to conduct its own investigation of the statements in Hollywood Federal's complaint. The defendant contends that without the Hollywood Federal fraud, the Complaint's allegations of fraud against DMC constitute claims of only one act or episode of racketeering activity, which cannot meet the requirement of a pattern of racketeering activity. The Court cannot accept this argument.

First, in considering a Rule 12(b)(6) motion, the Court must presume that all material factual allegations in the complaint are

---

**44.** *See Hollywood Fed. Sav. and Loan Ass'n v. TransOhio Sav. Bank*, No. 86–6786–Civ–Aronovitz (S.D.Fla. Sept. 25, 1987).

**45.** *Id.*

true. *See, e.g., Miree v. DeKalb County, Ga.,* 433 U.S. 25, 27 n. 2, 97 S.Ct. 2490, 2492 n. 2, 53 L.Ed.2d 557 (1977); *Jenkins v. McKeithen,* 395 U.S. 411, 421, 89 S.Ct. 1843, 1848, 23 L.Ed.2d 404 (1969); *see generally* 2A J. Moore, J. Lucas & G. Grotheer, *Moore's Federal Practice* ¶ 12.07[2.—5] (2d ed. 1985) [hereinafter "J. Moore"]. If the statements were a sham, of course, the Court could strike the allegations. Fed.R.Civ.P. 12(f); *see* J. Moore, *supra,* ¶ 12.21[1], at 12–171. Absent circumstances indicating that the claims concerning Hollywood Federal are a sham, however, the Court must accept the truth of these allegations.

Second, even if the Court were under no obligation to treat the allegations in the Complaint as true under Rule 12(b)(6), the plaintiff's attorney's signature on the Complaint "constitutes a certificate by the signer that the signer has read the pleading ...; that to the best of the signer's knowledge, information, and belief formed after reasonable inquiry it is well grounded in fact...." Fed.R.Civ.P. 11.

If the defendant wishes to allege that the plaintiff's attorney did not undertake a reasonable investigation into the allegations he incorporated into the Complaint, the Court will entertain a motion under Rule 11 for sanctions. Further, if the record reveals the Hollywood Federal allegations to be untrue, then the Court can grant summary judgment or a directed verdict on the RICO claims for lack of the requisite number of racketeering acts. Fed.R.Civ.P. 50(a), 56(c).[46] Until then, however, the Court must presume that the plaintiff conducted a reasonable inquiry into the Hollywood Federal matter and drafted its complaint on the knowledge, information, and belief stemming from a reasonable investigation. Therefore, the Court cannot dismiss the Complaint for failure to investi-

gate Hollywood Federal's allegations at this juncture.

### B. *Dismissal of the Hollywood Federal Complaint*

The defendant presents a second reason why the Court should disregard the allegations concerning TransOhio's alleged defrauding of Hollywood Federal. It asserts that the Court must treat DMC's claims pertaining to Hollywood Federal as null, since the Southern District of Florida dismissed Hollywood Federal's suit. This argument fails as well.

Dismissal of the *Hollywood Federal* case is not in and of itself relevant to the Court's decision to accept as true for purposes of this motion the claims in DMC's complaint. A court may dismiss a case for any number of reasons, and if dismissed without prejudice, Hollywood Federal is free to refile. If so, the dismissal would have had no permanent effect. Dismissal of the prior case would be relevant only if TransOhio can show that the Florida court's dismissal of the case had collateral estoppel effect in this case.

In general, a party asserting collateral estoppel must make a four-part showing: (1) "the precise issue raised in the present case must have been raised and actually litigated in the prior proceeding"; (2) "determination of the issue must have been necessary to the outcome of the prior proceeding"; (3) "the prior proceeding must have resulted in a final judgment on the merits"; and (4) "the party against whom estoppel is sought must have had a full and fair opportunity to litigate the issue in the prior proceeding." *NAACP v. Detroit Police Officers Ass'n,* 821 F.2d 328, 330 (6th Cir.1987); *see, e.g., Allen v. McCurry,* 449 U.S. 90, 94–95, 101 S.Ct. 411, 414–15, 66 L.Ed.2d 308 (1980); 18 C. Wright, A. Miller & E. Cooper, *Federal Practice and Procedure* § 4416 (1981).

---

46. *See, e.g., Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986) (entry of summary judgment is appropriate, "after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986) (standard for summary judgment "mirrors the standard for a directed verdict under Federal Rule of Civil Procedure 50(a)").

■ Without passing on the possible presence of all of the elements of collateral estoppel in this case, it is sufficient to note that the Florida court dismissed *Hollywood Federal* merely for want of personal jurisdiction over TransOhio. *See Hollywood Fed. Sav. and Loan Ass'n v. TransOhio Sav. Bank,* No. 86–6786–Civ–Aronovitz (S.D.Fla. Sept. 25, 1987). The court never reached the merits of the case, never "actually litigated" the truth of the claims in Hollywood Federal's complaint, and therefore never gave the parties a full and fair opportunity to litigate the merits. The dismissal of the case, then, implies no judgment on the truth of the allegations. Accordingly, this Court cannot grant the Florida decision preclusive effect in this case.

■ In conclusion, the Court holds that the plaintiff has stated a claim upon which relief can be granted under RICO. The Complaint indeed alleges two acts of racketeering, two episodes of racketeering activity under a common scheme, forming a pattern of racketeering activity. The two episodes are the fraud involving DMC and that pertaining to Hollywood Federal.[47] The Court must presume that these factual allegations are true when deciding this Rule 12(b)(6) motion and also must presume that the plaintiff initiated a reasonable inquiry into the facts set forth in the Complaint, Fed.R.Civ.P. 11. Moreover, the order from the Southern District of Florida dismissing the case stemming from the alleged fraud on Hollywood Federal does not preclude this Court from litigating the veracity of the plaintiff's allegations concerning Hollywood Federal. The defendant's motion to dismiss the RICO claims, therefore, is without merit.

### III. PENDENT JURISDICTION

■ The defendant's third contention in its motion to dismiss is the argument that the Court should decline to exercise jurisdiction over the state claims in this case in the absence of any other bases for federal jurisdiction. Given this Court's rejection of the defendant's argument for dismissal of the RICO counts, some claims remain in the Complaint which allow the plaintiff to invoke this Court's jurisdiction over civil actions arising under federal law, 28 U.S.C. § 1331 (1982). The Court has pendent jurisdiction over the remaining claims, those arising under state law, pursuant to *United Mine Workers v. Gibbs,* 383 U.S. 715, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966). Therefore, the defendant's motion to dismiss the state claims in this case is meritless.

WHEREFORE, upon consideration and being duly advised, the Court finds the defendant's Motion to Dismiss to be partially meritorious. Insofar as the defendant's motion seeks dismissal of the claims alleging securities fraud, Counts II and III, the motion is meritorious, and it is, therefore GRANTED. Inasmuch as the defendant's motion seeks dismissal of the claims alleging violations of RICO, the motion is meritless, and it is, therefore, DENIED. Finally, the defendant's motion, with respect to the dismissal of all state claims, is without merit, and thus is DENIED.

IT IS SO ORDERED.

---

47. Since the Court holds that the plaintiff's claims concerning DMC and Hollywood Federal suffice to constitute allegations of a "pattern of racketeering activity," the Court does not need to address the question of whether the multiple acts committed pursuant only to the fraud perpetrated upon DMC would suffice, in and of themselves, to state a claim under RICO.